# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF MISSISSIPPI

**FAULKNER LITERARY RIGHTS, LLC**                     **PLAINTIFF**

**VS.**                    **CIVIL ACTION NO. 3:12-CIV-100-M-A**

**SONY PICTURES CLASSICS INC.**
**And JOHN DOE PERSONS OR**
**ENTITIES 1-100**                     **DEFENDANTS**

## MEMORANDUM OF LAW IN SUPPORT OF SONY PICTURES CLASSICS INC.'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT FOR FAILURE TO STATE A CLAIM ON WHICH RELIEF MAY BE GRANTED

LOEB & LOEB LLP
Christian D. Carbone (*Pro Hac Vice*)
Thomas Nolan (*Pro Hac Vice*)
345 Park Avenue
New York, New York 10154-1895
(212) 407-4000

BUTLER, SNOW, O'MARA,
STEVENS & CANNADA, PLLC
Paul S. Rosenblatt (MSB#104223)
Anita Modak-Truran (MSB# 99442)
1020 Highland Colony Parkway
Ridgeland, Mississippi 39157
(601) 948-5711

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ............................................................................ iii

PRELIMINARY STATEMENT ...................................................................... 1

FACTUAL BACKGROUND ........................................................................... 2

    A.    The Film *Midnight in Paris* .............................................................. 2

    B.    Mr. Faulkner's Novel *Requiem for a Nun* ........................................ 3

ARGUMENT:  PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED
    FOR FAILURE TO STATE A CLAIM ON WHICH RELIEF MAY
    BE GRANTED ........................................................................................ 5

Legal Standard ............................................................................................... 5

    A.    Plaintiff's Copyright Claims Fail As A Matter Of Law ................... 6

        1.    The Film's Use of the Book is *De Minimis* and Not
            Actionable Infringement ........................................................ 6

        2.    The Film's Use of the Book is a Fair Use Expressly
            Allowed by Section 107 of the Copyright Act ....................... 8

            a.    Factor 1:  The Highly Transformative Nature of
                the Use Strongly Outweighs any Potential
                Commercial Nature of the Film ................................ 11

            b.    Factor 2:  The Nature of Plaintiff's Work is
                Expressive ............................................................... 15

            c.    Factor 3:  The Amount and Substantiality of the
                Portion Used is Miniscule ........................................ 15

            d.    Factor 4:  The Effect on the Market for the Book Is
                Nonexistent ............................................................... 16

    B.    Plaintiff's Lanham Act Claim Fails As A Matter Of Law .............. 18

        1.    Plaintiff's Purported "Lanham Act" Claim Improperly
            Seeks to Subvert Copyright Law .......................................... 18

        2.    The First Amendment Prohibits The Lanham Act Claim ..... 19

# TABLE OF CONTENTS

**Page**

    C.    Plaintiff's "Commercial Appropriation" Claim Fails As A Matter Of Law ............................................................................ 21

        1.    The Copyright Act Preempts the Appropriation Claim ........ 21

        2.    The Appropriation Claim Fails on Its Own Merits ............... 22

CONCLUSION ................................................................................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abilene Music, Inc. v. Sony Music Entm't, Inc.*,
   320 F. Supp. 2d 84 (S.D.N.Y. 2003) ..................................................................9

*Axxiom Mfg., Inc. v. McCoy Inv., Inc.*,
   Civ. A. No. H-09-3735, 2010 WL 2545584 (S.D. Tex. June 21, 2010) ..........5, 6

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
   448 F.3d 605 (2d Cir. 2006) .............................................................................13

*Blanch v. Koons*,
   467 F.3d 244 (2d Cir. 2006) ....................................................... 10, 11, 13, 17

*Brasel v. Hair Co.*,
   976 So.2d 390 (Miss. App. 2008) .....................................................................22

*Brownmark Films, LLC v. Comedy Partners*,
   682 F.3d 687 (7th Cir. 2012) ..............................................................................5

*Burnett v. Twentieth Century Fox Film Corp.*,
   491 F. Supp. 2d 962 (C.D. Cal. 2007) ................................................................6

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994) ...................................................................................passim

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002) ...............................................................................5

*Consumers Union of United States, Inc. v. Gen. Signal Corp.*,
   724 F.2d 1044 (2d Cir. 1983) ...........................................................................16

*Daboub v. Gibbons*,
   42 F.3d 285 (5th Cir. 1995) ........................................................................21, 22

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
   539 U.S. 23 (2003) ......................................................................................18, 20

*ETW Corp. v. Jireh Pub., Inc.*,
   332 F.3d 915 (6th Cir. 2003) ............................................................................20

*Feist Publ'ns, Inc. v. Rural Telephone Ser. Co.*,
 499 U.S. 340 (1991).......................................................................................7

*Frosch v. Grosset & Dunlap, Inc.*,
 75 A.D.2d 768 (N.Y. App. Div. 1st Dep't 1980).............................................23

*GlobeRanger Corp. v. Software AG*,
 691 F.3d 702 (5th Cir. 2012)........................................................................21

*Gottlieb Dev. LLC v. Paramount Pictures Corp.*,
 590 F. Supp. 2d 625 (S.D.N.Y. 2008) ............................................................5

*Jackson v. Washington Monthly Co.*,
 481 F. Supp. 647 (D.D.C. 1979), *aff'd*, 675 F.2d 1340 (D.C. Cir. 1982)............7

*Joseph Burstyn, Inc. v. Wilson*,
 343 U.S. 495 (1952).....................................................................................19

*Leadsinger, Inc. v. BMG Music Pub.*,
 512 F.3d 522 (9th Cir. 2008)..........................................................................6

*Leibovitz v. Paramount Pictures Corp.*,
 137 F.3d 109 (2d Cir. 1998)....................................................................16, 17

*MasterCard Int'l Inc. v. Nader 2000 Primary Comm., Inc.*,
 No. 00 Civ. 6068, 2004 WL 434404 (S.D.N.Y. Mar. 8, 2004) .........................16

*Matthews v. Wozencraft*,
 15 F.3d 432 (5th Cir. 1994)......................................................................23, 24

*Memphis Dev. Found. v. Factors Etc., Inc.*,
 616 F.2d 956 (6th Cir. 1980)........................................................................23

*Mist-On Systems, Inc. v. Gilley's European Tan Spa*,
 303 F. Supp. 2d 974 (W.D. Wis. 2002) .........................................................19

*Parker v. Dufresne*,
 781 F. Supp. 2d 379 (W.D. La. 2011) ..............................................................8

*Peter Letterese & Assocs. v. World Inst. of Scientology Enters.*,
 533 F.3d 1287 (11th Cir. 2008).....................................................................15

*Randolph v. Dimension Films*,
634 F. Supp. 2d 779 (S.D. Tex. 2009), *aff'd*, 381 Fed. App'x 449 (5th Cir. 2010) ........................................................................................................6

*Rogers v. Grimaldi*,
875 F.2d 994 (2d Cir. 1989)................................................................ 19, 20, 24

*Sanders v. Chamblee*,
819 So.2d 1275 (Miss. 2002) ........................................................................23

*Schad v. Borough of Mount Ephraim*,
452 U.S. 61 (1981)........................................................................................19

*Straus v. DVC Worldwide, Inc.*,
484 F. Supp. 2d 620 (S.D. Tex. 2007).......................................................... 7-8

*Sugar Busters LLC v. Brennan*,
177 F.3d 258 (5th Cir. 1999)........................................................................20

*Triangle Publ'ns Inc. v. Knight-Ridder Newspapers, Inc.*,
626 F.2d 1171 (5th Cir. 1980).......................................................................14

*Vault Corp. v. Quaid Software Ltd.*,
847 F.2d 255 (5th Cir. 1988).........................................................................7

*Werlin v. Reader's Digest Ass'n*,
528 F. Supp. 451 (S.D.N.Y. 1981) .................................................................7

*Westchester Media v. PRL USA Holdings, Inc.*,
214 F.3d 658 (5th Cir. 2000)....................................................................20, 21

*Young v. Wideawake Death Row Entm't, LLC*,
No. 10cv1019, 2011 U.S. Dist. LEXIS 54631 (C.D. Cal. June 7, 2010).....20, 21

## STATUTES & RULES

15 U.S.C. § 1127.........................................................................................18

17 U.S.C. § 107 .....................................................................................passim

17 U.S.C. § 301(a) ......................................................................................21

Fed. R. Civ. P. 12...................................................................................... 5-6

Cal. Civ. Code § 3344.1 ...............................................................................23

**OTHER AUTHORITIES**

Faulkner Institute at Southeast Missouri State University at
http://www.semo.edu/cfs/faulkneria/sightings.htm ...........................................8

2 Goldstein on Copyright § 12.2.1 ................................................................ 10-11

5 McCarthy on Trademarks and Unfair Competition § 28:42 (2010 ed.)...............23

2 Nimmer on Copyright § 8.01[G]...........................................................................7

4 Nimmer on Copyright § 13.03[A][2] ...................................................................7

4 Nimmer on Copyright § 13.05[A][2][a] .............................................................15

Posner, *When Is Parody Fair Use?*, 21 J. Legal Studies 67 (1992) .......................11

Defendant Sony Pictures Classics Inc. ("Sony Classics") respectfully submits this memorandum of law in support of its motion, pursuant to Fed. R. Civ. P. 12(b)(6), for an order dismissing the Complaint of Plaintiff Faulkner Literary Rights, LLC ("Plaintiff") for failure to state a claim on which relief may be granted.

## PRELIMINARY STATEMENT

In 2011 Sony Classics distributed the motion picture *Midnight in Paris*, written and directed by Woody Allen. The film's protagonist is on vacation in Paris with his fiancée and travels back in time to spend his evenings with great artists of the early 20th Century—F. Scott Fitzgerald, Ernest Hemingway, Gertrude Stein. When he tries to explain what is happening to his incredulous fiancée, the protagonist paraphrases a nine-word quote from William Faulkner, expressly attributed to Mr. Faulkner on-screen, and to great comic effect.

Plaintiff now claims the attributed paraphrase violates its copyright in *Requiem for a Nun*, a relatively obscure work by William Faulkner of some 220 pages originally published in 1954. Plaintiff also claims violations of the Lanham Act (claiming that consumers will somehow believe the late Mr. Faulkner commercially sponsored the film) and of Mississippi's common law (claiming that the use of Mr. Faulkner's name constitutes misappropriation).

As a matter of law, the use of a nine-word quotation from a full-length novel is a *de minimis* use and not copyright infringement at all. Moreover, the use at issue presents a classic case of "fair use," a critical doctrine fostering creative and artistic

expression, journalism, and scholarship. Plaintiff's extreme—and absurd—position in this case is that it is unlawful to even minimally quote Mr. Faulkner's work without its consent. Such a holding would be contrary to the very purpose of the Copyright Act, and other laws.

**FACTUAL BACKGROUND**

**A.** **The Film *Midnight in Paris***

*Midnight in Paris* (the "Film") is a film written and directed by Woody Allen and released by Sony Classics in 2011. It is set in modern-day Paris and follows the adventures of Gil Pender, a moderately successful Hollywood screenwriter vacationing with his fiancée, Inez, and her parents. (Film 0:00 - 11:38). Late one evening after a rooftop wine-tasting, Gil wanders the Paris streets, alone and deep in thought. (Film at 13:35 - 17:06). An antique car pulls up at the stroke of midnight. The passengers are laughing and drinking champagne. They invite Gil to join them, and he gets in the car. (*Id.* 17:07 - 19:00). They drive to a party, and Zelda and F. Scott Fitzgerald introduce themselves. Gil realizes that the man playing the great Cole Porter song "Let's Do It, Let's Fall in Love," is actually Cole Porter. Somehow, that car has taken Gil back in time to the 1920s. (*Id.* 19:01 - 22:31).

Gil starts spending his nights in the 1920s. He meets Ernest Hemingway in a café, drinking wine. (*Id.* 24:02 - 28:19). Hemingway takes him to Gertrude Stein's apartment, where Pablo Picasso is painting his mistress, Adriana. (*Id.* 35:35 - 42:01). Gil gives his novel to Ms. Stein, and she gives him the advice he needs to finish it.

2

(*Id.* 101:27 - 102:23, 1:24:10 - 1:24:53). Gil and Adriana also share a flirtation, and then a friendship, and then perhaps something more. It turns out that just as Gil pined for Paris in the 1920s, Adriana—who was from the 1920s—pined to live in the Belle Epoque, some 30 years before. She and Gil take a carriage ride late at night that takes them back to the Belle Epoque, where they go to the Moulin Rouge and meet Toulouse-Lautrec, Gaugin and Degas—luminaries from the late 1800's, all of whom themselves pine for the Renaissance. (*Id.* 1:13:50 - 1:24:10).

The tension between Gil and Inez grows and boils over into a fight at their hotel. Gil accuses Inez of having an affair with an old acquaintance and tells her he knows because Hemingway figured it out. Gil tries to explain how this is possible, and Inez thinks he's lost his mind. Exasperated, he tells her that "[t]he past is not dead! Actually, it's not even past. You know who said that? Faulkner. And he was right. And I met him too. I ran into him at a dinner party." (*Id.* 1:25:00 - 1:25:30). She admits the affair, and the two decide to go their separate ways—Gil will stay in Paris, and Inez will return home. (*Id.* 1:24:55 - 1:26:25).

**B.    Mr. Faulkner's Novel *Requiem for a Nun***

*Requiem for a Nun* (the "Book") is a novel by William Faulkner. Formally, it combines a narrative history of the fictional Yoknapatawpha County, Mississippi with a three-act stage play set in that county and focused on Temple Drake, a character from Mr. Faulkner's earlier novel, *Sanctuary*.

In the play (**Act I**), Temple's African-American nanny, Nancy, has been

3

sentenced to death for the murder of Temple's infant child. The play opens with a visit to Temple by Gavin Stevens—her uncle-in-law and Nancy's defense attorney—on the night before Nancy's execution. Gavin has come to ask Temple to plead the Governor for clemency—Nancy did kill the child, but Temple was not without guilt herself. Temple initially resists and tries to distance herself from her past. She had married Gavin's brother, Gowan Stevens, and had two children with him. Temple claims she is "Mrs[.] Gowan Stevens" now, that "Temple Drake" is a different person entirely, and "Temple Drake is dead." In response, Gavin tells her "The past is never dead. It's not even past." (Book 73). Gavin persists and ultimately prevails—Temple agrees to visit the Governor. (*Id.* 38-77).

**Act II.** Temple confesses her entire story to the Governor. In short, she was kidnapped but fell in love with her kidnapper and then fell in with a series of other criminals. One of them blackmailed her with love letters she'd written to her kidnapper, but the two of them then decided to swindle Gowan instead and run away together. Nancy discovered the plan and forced Temple to admit that she was willing to leave her children behind. Nancy says, ominously, "I tried everything I knowed. You can see that." She goes into the infant's nursery and smothers her. Temple discovers the body a few moments later, and screams. (*Id.* 89-153).

**Act III.** As expected, the Governor denies clemency, and Temple decides to visit Nancy in the jail before she dies. The two discuss pain and human suffering. Nancy doesn't understand why, but has found peace by simply believing in God and

4

tells Temple to just "Trust in Him" and "Believe."  (*Id.* 206-224).

# ARGUMENT[1]

## PLAINTIFF'S COMPLAINT SHOULD BE
## DISMISSED FOR FAILURE TO STATE A
## CLAIM ON WHICH RELIEF MAY BE GRANTED

### Legal Standard

This case presents clear issues of *de minimis* copying and fair use under the

Copyright Act.  The analysis of both issues turns entirely on the Film and the Book

themselves.  There are no factual disputes, the works are already properly before the

Court as documents integral to the Complaint, and discovery would not add anything

to the analysis.[2]  Courts commonly and increasingly dismiss copyright infringement

cases at the pleading stage based on fair use.  *See, e.g*, *Brownmark Films, LLC v.*

*Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) (affirming dismissal on fair use

grounds because the only evidence the court needed to consider was the two works

---

[1] Sony Classics has also filed a concurrent motion, in the alternative, for an order transferring venue to the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1404(a).

[2] On a motion to dismiss a copyright infringement claim, the Court may consider documents attached to the Complaint or incorporated in it by reference, as well as documents "integral" to the Complaint and relied on in it.  *See, e.g., Axxiom Mfg., Inc. v. McCoy Inv., Inc*., Civ. A. No. H-09-3735, 2010 WL 2545584, at *4 (S.D. Tex. June 21, 2010) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.") (collecting cases); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) (same); *Gottlieb Dev. LLC v. Paramount Pictures Corp.*, 590 F. Supp. 2d 625, 629-30 n.1 (S.D.N.Y. 2008) (same).  Accordingly, copies of the Film and the Book are attached hereto as Exhibits A and B, respectively, to the Declaration of Christian Carbone, filed concurrently.  Sony Classics further notes that the Court may, in its discretion, convert this motion to dismiss into a motion for summary judgment under Rule 56.  *See, e.g., Axxiom,* 2010 WL 2545584, at *4; *see also* Fed. R. Civ. P. 12(h)(2)("Failure to state a claim upon which relief can be granted … may be raised … by a motion under Rule 12(c)[.]")

themselves); *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 530 (9th Cir. 2008) (dismissing suit for declaratory judgment of fair use without leave to amend); *Burnett v. Twentieth Century Fox Film Corp.*, 491 F. Supp. 2d 962, 971-72 (C.D. Cal. 2007).

Fifth Circuit courts have dismissed copyright cases under Rule 12(b)(6) as a matter of course, including for lack of substantial similarity between the subject works. *See, e.g.*, *Randolph v. Dimension Films*, 634 F. Supp. 2d 779, 787-88 (S.D. Tex. 2009), *aff'd*, 381 Fed. App'x 449 (5th Cir. 2010) (denying reconsideration and affirming dismissal under Rule 12(b)(6) for lack of substantial similarity) (collecting cases); *Axxiom*, 2010 WL 2545584, at *5 (confirming such dismissal is proper and collecting cases). Moreover, Plaintiff's second and third causes of action—under the Lanham Act and Mississippi common law—are legally deficient on their face.

## A.    Plaintiff's Copyright Claims Fail As A Matter Of Law

Plaintiff's copyright claims fail because the Film's only use of the Book is an attributed paraphrase of just nine words of a novel, repurposed for comedic effect. This is a *de minimis* use that does not even rise to the level of infringement, and the Court may dismiss the claim on this ground alone. Moreover, even if not *de minimis*, this use is clearly fair use and, for this reason as well, not an infringement under the Copyright Act.

### 1.    The Film's Use of the Book is *De Minimis* and Not Actionable Infringement

The copyright claim should be dismissed because it fails to state any more than

6

a non-infringing *de minimis* taking of the Book.

To establish copyright infringement, the plaintiff must first prove copying. *Feist Publ'ns, Inc. v. Rural Telephone Ser. Co.,* 499 U.S. 340, 361 (1991). However, not all copying is copyright infringement—the copied portion of a work may be so slight, and its use so fleeting, that it does not rise to the level of infringement. "The legal maxim of *de minimis non curat lex* applies to copyright actions no less than to other branches of the law. Accordingly, … for similarity to be substantial, and hence actionable, it must apply to more than simply a *de minimis* fragment." 2 Nimmer on Copyright § 8.01[G]. Professor Nimmer confirms that there may be no infringement at all if "no more than a line, or a paragraph, or a page or chapter of the copyrighted work has been appropriated." *Id*. § 13.03[A][2].

Courts routinely dismiss copyright cases on precisely this ground, finding alleged copying to be *de minimis* and, therefore, not actionable. For example, the Fifth Circuit ruled that copying of approximately 30 characters of 50 pages of computer source code was "not significant" and not infringing. *Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255, 267-68 (5th Cir. 1988). In *Werlin v. Reader's Digest Ass'n*, the court found copying of two sentences of news article *de minimis* and not infringing. 528 F. Supp. 451, 464 (S.D.N.Y. 1981). *Jackson v. Washington Monthly Co.* held the same for two sentences that were copied with attribution. 481 F. Supp. 647, 650-51 (D.D.C. 1979), *aff'd*, 675 F.2d 1340 (D.C. Cir. 1982). In *Straus v. DVC Worldwide, Inc.*, the court found that the appearance of a copyrighted photograph in a

7

2-3 second "snippet" at the end of a thirty second commercial to be *de minimis* use. 484 F. Supp. 2d 620, 641 (S.D. Tex. 2007). And in *Parker v. Dufresne*, the court found no infringement from taking "a few words and ideas from passages in [a] manuscript" that were "used in a way to convey different or even opposite meanings." 781 F. Supp. 2d 379, 386-87 (W.D. La. 2011).

We have found no case finding infringement from a nine word paraphrase, or anything even close to that. To the contrary, these specific nine words of Mr. Faulkner's Book are widely paraphrased in a variety of contexts. For example, the passage has been used in the Ben Folds Five song "Smoke" ("You keep on saying the past is not dead … You keep saying the past is not even past"), an ABC News broadcast on the Kennedy assassination ("The past is never dead. It isn't even past."), a New York Times article on the Chicago Cubs ("Cubs' Past Isn't Dead; It Isn't Even Past"), and in the celebrated speech by then-Senator Barack Obama titled "A More Perfect Union" ("The past isn't dead and buried. In fact, it isn't even past.").[3] The use of these nine words is simply not actionable under the Copyright Act.

### 2. The Film's Use of the Book is a Fair Use Expressly Allowed by Section 107 of the Copyright Act.

Even if the Film's paraphrase rises above a *de minimis* level, it is still not an infringement because it is a classic fair use under Section 107 of the Copyright Act.

---

[3] *See, e.g.*, the "Faulkner Sightings" webpage maintained by the Faulkner Institute at Southeast Missouri State University at http://www.semo.edu/cfs/faulkneria/sightings.htm.

The fair use doctrine is an "equitable rule of reason" that creates an exception to the copyright monopoly and "permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994) (alteration in original). "The affirmative defense of fair use fosters artistic dialogue and influence within the copyright regime by protecting authors' rights [to] build upon and transform existing works without having to purchase a license to do so." *Abilene Music, Inc. v. Sony Music Entm't, Inc.*, 320 F. Supp. 2d 84, 88 (S.D.N.Y. 2003) (quoting *Campbell*, 510 U.S. at 575).

This defense is codified in Section 107 of the Copyright Act, entitled "Limitations on Exclusive Rights: Fair Use," which provides for an exception to liability for unauthorized use of a copyrighted work. Section 107 provides, in full, as follows:

> Notwithstanding the provisions of sections 106 and 106A [establishing copyright owners' exclusive rights], the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include —
>
> (1)   the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2)   the nature of the copyrighted work;

(3)    the amount and substantiality of the portion used in relation to
the copyrighted work as a whole; and

(4)    the effect of the use upon the potential market for or value of
the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair
use if such finding is made upon consideration of all the above
factors.

17 U.S.C. § 107. The statute provides examples of common fair uses—criticism,

scholarship, etc.—but this is by no means an exclusive list. *Campbell* confirms that

the preamble paragraph is "illustrative and not limitative," that it provides "only

general guidance about the sorts of copying that courts and Congress most commonly

had found to be fair uses." 510 U.S. at 577-78. Courts routinely find fair use in

categories outside the illustrative list—for example, parody and satire. *Id*. at 579-80.

In ruling on fair use, courts must explore all of the statutory factors together,

and weigh the results together, in light of the purposes of copyright. 510 U.S. at 578.

As the Second Circuit recently reiterated, "[t]he ultimate test of fair use . . . is

whether the copyright law's goal of 'promoting the Progress of Science and useful

Arts,' U.S. Const., art. I, § 8, cl. 8, 'would be better served by allowing the use than

by preventing it.'" *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006) (quoting

*Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 141 (2d Cir.

1998)). Moreover, the court must "determine whether the social benefit of the

infringing use outweighs the corresponding loss to the copyright owner." 2 Goldstein

on Copyright § 12.2.1 (citing, *inter alia*, *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984)).

Fair use is an integral part of the Copyright Act.  Without fair use, critics and scholars could not quote the very works they write about.  Andy Warhol's art would be almost entirely infringing, and satirists such as "The Daily Show" and "Saturday Night Live" could never parody a movie or a TV show—indeed, parody itself would be essentially impossible.  Posner, *When Is Parody Fair Use?*, 21 J. Legal Studies 67, 73 (1992).

### a. Factor 1: The Highly Transformative Nature of the Use Strongly Outweighs any Potential Commercial Nature of the Film

The first statutory factor—the purpose and character of the use—weighs heavily in favor of fair use.  The first factor is the most important—it is "[t]he heart of the fair use inquiry."  *Blanch*, 467 F.3d at 251-52.  Prior to the Supreme Court's decision in *Campbell*, many courts primarily considered whether a use was educational (weighing in favor of fair use) or commercial (weighing against it). *Campbell* squarely corrected that error, expressly ruling that "the commercial or nonprofit educational purpose of a work is only one element of the first factor enquiry into its purpose and character," that a "sensitive balancing of interests" is required, and that commercial use is just one factor to be "weighed along with other[s] in fair use decisions."  510 U.S. at 584-85.

The key question for the first factor—indeed, in fair use at large—is whether

the defendant's use effectively replaces or supplants the copyrighted work, or whether instead it transforms it into something new. *Campbell* confirms that the "central purpose" of the fair use inquiry is to determine "whether the new work merely 'supersede[s] the objects' of the original creation … or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is 'transformative.'" 510 U.S. at 579 (quoting *Folsom v. Marsh*, 9 F.Cas. 342, 348 (C.C. Mass. 1841)). The Film is a transformative work under these standards, and the specific use of Mr. Faulkner's line is also a highly transformative use.

As to the works as a whole: Mr. Faulkner's Book is serious-minded, somber work of literature set in historical Mississippi that addresses themes of sin and redemption, unforeseen consequences of past acts, and the sweeping power of historical dynamics. The Film, in contrast, is a fantasy and romantic comedy, set in Paris (both present and past), and addresses the seductiveness—and the limitations—of nostalgia for earlier times. It is a completely different sort of work with a completely different plot, structure, and artistic purpose.

Moreover, the specific use of the line in the Film is highly transformative as well. Mr. Faulkner's line is somber and sardonic. Gavin Stevens—defense counsel for the woman sentenced to hang for smothering Temple Drake's infant child to death—is trying to convince Ms. Drake (through guilt) to plead for her clemency.

12

Ms. Drake tries to distance herself from her past, claiming that she is "Mrs. Gowan Stevens" now, and that "Temple Drake is Dead." Mr. Stevens replies, "The past is never dead. It's not even past." (Book at 73).

In the Film, Mr. Faulkner's seemingly somber metaphor about the long-lasting consequences of the past is turned into a literal statement of fact—the past "isn't dead" because Gil is transported there every night. He has shared a table with Hemingway, taken notes on his manuscript from Gertrude Stein, and discussed the sur-reality of his situation with Salvador Dalí and Man Ray. For him the past was, literally, alive—so alive, in fact, that he actually ran into Mr. Faulkner at a dinner party. This joke is a parody of Mr. Faulkner's somber line, and easily a "transformative" use well within the bounds of fair use. *Campbell*, 510 U.S. at 579; *Bill Graham Archives v. Dorling Kindersley Ltd*., 448 F.3d 605 (2d Cir. 2006) (fair use to reproduce seven copyrighted photographs from Grateful Dead tickets and posters and include them in defendants illustrated for-profit book on the Grateful Dead); *Blanch*, 467 F.3d at 258 (fair use to copy photograph from fashion magazine in painting addressing popular culture).

Comparison with the Supreme Court's decision in *Campbell v. Acuff-Rose Music, Inc.* confirms just how readily the Film falls within the bounds of fair use. In *Campbell*, the Court found that 2 Live Crew's hip hop parody of Roy Orbison's "Oh, Pretty Woman" was a fair use. The lower court had ruled against fair use because the Sixth Circuit viewed the "commercial" nature of the use as almost entirely

13

dispositive. 510 U.S. at 573-74, 588. The Supreme Court disagreed. The parties did not contest that the taking was substantial enough to be infringing absent the fair use defense (*id.* at 574, 588), but the Court found that the parody was a transformative use (*id.* at 578-83), that the commercial nature of the use was just one factor among many to weigh (*id.* at 584-85), and that it was unlikely to supplant the market for Mr. Orbison's song. *Id.* at 590-94.

This case presents a substantially *more* compelling claim to fair use than that recognized in *Campbell*. In *Campbell*, Mr. Orbison's work was a popular song, and 2 Live Crew's parody was also a popular song, comparable in length and format (if not in tone), that unmistakably brought Mr. Orbison's song to mind. Here, there is *no* substantial taking—the Film paraphrases just one line of a 224-page novel, and uses it in a romantic comedy as a joke. As identified *supra*, the only "taking" here is *de minimis* and not actionable at all.

Moreover, as in *Campbell*, the Film was released commercially, but this does not mean that its use of the Book was not a fair one. The Film is an artistic rather than purely commercial work (such as an ad), and its use of the Book is itself artistic rather than commercial—i.e., it's a joke. And further, even if it were deemed "commercial" for these purposes, the legislative history of Section 107 makes clear that it "is not intended to be interpreted as any sort of not-for-profit limitation on educational uses of copyrighted works." *Triangle Publ'ns Inc. v. Knight-Ridder Newspapers, Inc.*, 626 F.2d 1171, 1175 (5th Cir. 1980) (citing 4 Nimmer on

14

Copyright § 13.05(A)).  To the contrary, where a use is highly transformative, this "less[ens] the significance of other factors, like commercialism, that may weigh against a finding of fair use."  *Campbell*, 510 U.S. at 579.

   b. <u>Factor 2:  The Nature of Plaintiff's Work is Expressive</u>

Sony Classics concedes that the Book is an expressive work and thus entitled to the "core" of copyright protection.  *See, e.g.*, *Campbell*, 510 U.S. at 586.  This does not, of course, render the Film's use unfair.  In fact, the Supreme Court noted in *Campbell* that this factor was "not much help in this case, or ever likely to help much in separating the fair use sheep from the infringing goats" since many fair use cases—there, a parody case—involve copying of "publicly known, expressive works."  *Id.* at 586.  *See also* 4 Nimmer on Copyright § 13.05[A][2][a] (this factor "typically recedes into insignificance in the greater fair use calculus").  This factor is neutral.

   c. <u>Factor 3:  The Amount and Substantiality of the Portion Used is Miniscule</u>

The amount and substantiality of the Film's use of the Book is miniscule.  The Film presents an attributed paraphrase of just nine words out of a 224-page novel. Although a small taking does not establish fair use *ipso facto*, courts consider "whether the amount taken is reasonable in light of the purpose of the use and the likelihood of market substitution."  *Peter Letterese & Assocs. v. World Inst. of Scientology Enters.*, 533 F.3d 1287, 1314 n.30 (11th Cir. 2008) (citing *Campbell*, 510 U.S. at 588).  While the line at issue is recognizable, it is a passing line, not the

conceptual "heart" of the Book, and many cases have found fair use with much greater copying that present here. *See, e.g.*, *Consumers Union of United States, Inc. v. Gen. Signal Corp.*, 724 F.2d 1044, 1050 (2d Cir. 1983) (finding verbatim copying of 29 words out of a total of 2100 to be "relatively insubstantial" and a fair use); *Campbell*, 510 U.S. at 588 (copying of characteristic bass riff and opening line of "Pretty Woman" was fair use); *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 116 (2d Cir. 1998) (copying virtually entire work for purposes of parodic advertisement held fair); *MasterCard Int'l Inc. v. Nader 2000 Primary Comm., Inc.*, No. 00 Civ. 6068, 2004 WL 434404, at *14-15 (S.D.N.Y. Mar. 8, 2004) (applying same analysis and finding that parody ad did not take more than was reasonable from MasterCard advertisement); *see also* Section A.1, *supra*, re. *de minimis* use cases. The insubstantiality of the amount taken clearly favors fair use.

      d.    Factor 4:  The Effect on the Market for the Book Is Nonexistent

The fourth factor considers "the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107(4).  *Campbell* instructs that the *only* harm that is cognizable under this analysis is the harm of "market substitution" for the original work or for derivative works.  *Campbell*, 510 U.S. at 590-92.  In the context of parody or other types of commentary or criticism, other "harm" to the market for the work, such as the fact that the work may now be less popular or less attractive as a result of it being parodied or subject to criticism, has no bearing on the fair use analysis.  *Id*.  The Second Circuit found that:

16

> In considering the fourth factor, [the court's] concern is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use usurps the market of the original work. The market for potential derivative uses includes only those that creators of original works would in general develop or license others to develop.

*Blanch*, 467 F.3d at 258 (citation omitted); *Campbell*, 510 U.S. at 592.

The analysis of this factor here is clear-cut. Plaintiff's Complaint makes no allegations concerning the effect of the Film on the market for the Book. In this context, however, the Court need not consider it. The quote is a paraphrase of only one line of the Book, is made in a movie and not in a novel, and is expressly attributed to Mr. Faulkner. This is a truly transformative use in a truly transformative work. In no way, shape or form could this possibly be a substitute for Mr. Faulkner's Book and it will certainly not supplant sales of the Book. *See, e.g.*, *Blanch*, 467 F.3d at 258 (no possibility of market harm from use of photograph from fashion magazine in painting commenting on popular culture).[4] This factor weighs decisively in favor of fair use here.

In sum, balancing all of the factors, it is absolutely clear that the Film's paraphrase of these nine words is a fair use and not actionable.

---

[4] Even if Plaintiff claimed loss of *licensing income* as market harm—and it has not even done that—this would still fail as a matter of law. The Second Circuit expressly rejected this same claim in *Leibovitz*. 137 F.3d. at 116-17 ("[Plaintiff's] only argument for actual market harm is that the defendant has deprived her of a licensing fee by using the work as an advertisement. But she is not entitled to a licensing fee for a work that otherwise qualifies for the fair use defense as a parody.").

**B.**     <u>Plaintiff's Lanham Act Claim Fails As A Matter Of Law</u>

The Lanham Act is a consumer protection statute and primarily regulates trademarks and false advertising.  The Lanham Act has very narrow application to creative works, such as the Film, and it is well-settled that the trademark rights it protects must yield when they conflict with First Amendment interests.  Moreover, where, as here, the imposition of a Lanham Act claim purports to supplement or circumvent the protections afforded by the Copyright Act, a Lanham Act claim simply cannot stand.  Plaintiff's Lanham Act claim fails as a matter of law.

**1.**     **Plaintiff's Purported "Lanham Act" Claim Improperly Seeks to Subvert Copyright Law**

Plaintiff's Complaint contends that the Lanham Act encompasses the Film's use of the quote from Mr. Faulkner's novel and the single mention of his name.  Yet the Supreme Court has confirmed that the Lanham Act was "intended to make 'actionable the deceptive and misleading use of marks,' and 'to protect persons engaged in ... commerce against unfair competition.'"  *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28 (2003) (citing the Lanham Act itself at 15 U.S.C. § 1127).  Moreover, the Supreme Court has also refused to allow the Lanham Act to encroach on copyright, finding that the Lanham Act has common-law origins "which were *not* designed to protect originality or creativity," and that allowing such encroachment "would be akin to finding that the [Lanham Act] created a species of perpetual patent and copyright, which Congress may not do."  539 U.S. at 37.

Plaintiff's Lanham Act claim is based on precisely the same conduct as its copyright claim—use of the passage from the Book, attributed on-screen to Mr. Faulkner. Compl. ¶¶ 21-22. This is nothing but a (failed) copyright claim in disguise, and Plaintiff cannot use the Lanham Act to circumvent that reality. *See, e.g.*, *Mist-On Systems, Inc. v. Gilley's European Tan Spa*, 303 F. Supp. 2d 974, 981 (W.D. Wis. 2002) ("plaintiff cannot recover under the Lanham Act for the same alleged conduct upon which it bases its copyright claim").

**2.      The First Amendment Prohibits The Lanham Act Claim**

Even if the facts of this case could somehow fall under the scope of the Lanham Act, the use complained of is squarely protected by the First Amendment. The Supreme Court has observed that "[e]ntertainment, as well as political and ideological speech, is protected," and that "motion pictures … fall within the First Amendment guarantee." *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981); *see also Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952) ("It is urged that motion pictures do not fall within the First Amendment's aegis because their production, distribution, and exhibition is a large-scale business conducted for private profit. We cannot agree."). It is also well-settled that the Lanham Act "should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression." *Rogers v. Grimaldi*, 875 F.2d 994, 998-99 (2d Cir. 1989) (film titled "Fred and Ginger" by Federico Fellini did not indicate that Ms. Rogers endorsed the film or had

any role in producing it, and therefore, there was no Lanham Act violation based on false advertising of sponsorship or endorsement). *Rogers* has been widely followed by other Circuits, and the Fifth Circuit has expressly endorsed *Rogers* in the context of literary titles, finding that the risk of confusion must be "particularly compelling" to outweigh First Amendment interests. *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 269 n.7 (5th Cir. 1999).

The Film is an expressive work entitled to full First Amendment protections, and therefore, the risk of consumer confusion must be "particularly compelling" to justify a Lanham Act claim. *Id.* As a simple matter of common sense, there is zero chance—much less a "particularly compelling" one—that any consumer could possibly believe that Mr. Faulkner somehow "sponsored" the Film. Indeed, the *Rogers* court rejected a similar claim when the film in question featured a dancing duo and used Ms. Rogers' name in the title. 875 F.2d at 996-97; *see also Dastar*, 539 U.S. at 36; *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 672 (5th Cir. 2000); *Young v. Wideawake Death Row Entm't, LLC*, No. 10cv1019, 2011 U.S. Dist. LEXIS 54631 (C.D. Cal. June 7, 2010). Under Plaintiff's apparent theory, every single reference to a novel not in the public domain (or to its author) would violate the Lanham Act.

Moreover, any remote possibly of confusion is overwhelmingly outweighed by the filmmaker's rights of artistic expression. *See, e.g.*, *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 937 (6th Cir. 2003) (granting summary judgment re. painting of golfer

Tiger Woods *even with survey evidence of actual confusion*). *Westchester Media,*

214 F.3d at 672 ("Where the allegedly infringing speech is at least partly literary or

artistic … and not solely a commercial appropriation of another's mark, the preferred

course is to accommodate trademark remedies with First Amendment interests.");

*Young*, 2011 U.S. Dist. LEXIS 54631 (same).

**C.**     **Plaintiff's "Commercial Appropriation" Claim Fails As A Matter Of Law**

Plaintiff's final claim is for "commercial appropriation" of the "name and

works of William Faulkner." To the extent it is based on copying of Mr. Faulkner's

works, this is a copyright claim in disguise and clearly preempted by the Copyright

Act. And to the extent it is based on some other interest, it clearly fails on its own

accord, as it is entirely appropriate to include a properly attributed a paraphrase of a

deceased author in a film. This claim fails as a matter of law as well.

**1.**     **The Copyright Act Preempts the Appropriation Claim**

The Copyright Act expressly preempts state law causes of action "that are

equivalent to any of the exclusive rights within the general scope of copyright." 17

U.S.C. § 301(a); *GlobeRanger Corp. v. Software AG*, 691 F.3d 702, 706 (5th Cir.

2012). A state law cause of action is preempted if it is "within the subject matter of

copyright," and protects rights that are "equivalent" to any of the exclusive rights of a

federal copyright, as provided in 17 U.S.C. § 106. *Daboub v. Gibbons*, 42 F.3d 285,

288-89 (5th Cir. 1995). The substance of Plaintiff's "appropriation" claim is that

Sony Classics "appropriated the name and works of William Faulkner." Compl. ¶ 26.

21

This is nothing but a reformulated copyright claim—that is, of copying Mr.

Faulkner's novel. It is within the very heart of the subject matter of copyright, and

addresses rights precisely equivalent to those protected by the Copyright Act.

*Daboub*, 42 F.3d at 290 (rejecting attempts to avoid preemption as "like a

ventriloquist's attempt to present a copyright action in the voice of state law claims").

It is preempted as a matter of law.

> **2.** **The Appropriation Claim Fails on Its Own Merits**

Even assuming that the Copyright Act somehow does not preempt Plaintiff's

"appropriation" claim, it would still fail on its merits. While Plaintiff does not

specifically identify any statute or common law right, under Mississippi law the terms

"commercial" and "appropriation" generally refer to a species of privacy rights. For

example, in *Brasel v. Hair Co.*, 976 So.2d 390 (Miss. App. 2008), the court stated

that one branch of "the tort of invasion of privacy [is] the appropriation of another's

identity for an unpermitted use," and that "[i]n order to prevail on a claim based on

appropriation of one's likeness for commercial gain, a plaintiff must show that the

defendant: (1) appropriated his name or likeness, (2) without consent, (3) for use in a

commercial enterprise." *Id*. at 392. This "privacy" claim fails for several reasons.

First, in so far as Plaintiff claims appropriation of Mr. Faulkner's name, Mr.

Faulkner is deceased, and thus has no "privacy" right that can be invaded. 5

McCarthy on Trademarks and Unfair Competition § 28:42 (2010 ed.) ("A cause of

action for invasion of privacy cannot be asserted by anyone other than the person

whose privacy was invaded. This means that the survivors of a deceased person whose privacy is invaded have no standing to sue.") (collecting cases and other authorities). Mississippi has not recognized any post-mortem privacy rights of this nature, and Plaintiff therefore has no "privacy" right to assert. *Sanders v. Chamblee*, 819 So.2d 1275, 1279 (Miss. 2002) ("The record is devoid of any conceivable postmortem privacy interest the decedent could have[.]").

Second, even if Plaintiff were asserting a form of *publicity* right rather than privacy right, Mississippi has not recognized any post-mortem publicity right either, whether by statute or by common law, and many jurisdictions to have considered the issue have also rejected such claims. *See, e.g.*, *Memphis Dev. Found. v. Factors Etc., Inc.*, 616 F.2d 956 (6th Cir. 1980); *Frosch v. Grosset & Dunlap, Inc.*, 75 A.D.2d 768 (N.Y. App. Div. 1st Dep't 1980). Typically, any such post-mortem rights are addressed by statute. *See, e.g.*, Cal. Civ. Code § 3344.1 (providing a limited post-mortem publicity right, but only for the advertising or sale of goods or services).

Third, even if Mississippi did recognize any such post-mortem interest—and it does not—the claim would *still* fail because Mr. Faulkner's name is used in a film, not an advertisement. "Courts long ago recognized that a celebrity's right of publicity does not preclude others from incorporating a person's name, features or biography in a literary work, motion picture, news or entertainment story. Only the use of an individual's identity in ***advertising*** infringes on the persona." *Matthews v. Wozencraft*, 15 F.3d 432, 439 (5th Cir. 1994) (Texas law) (emphasis added and

23

citation omitted). The use of a celebrity's name in a movie is protected by the First Amendment when it is "clearly related to the content of the movie and is not a disguised advertisement for the sale of goods or services or a collateral commercial product." *Rogers*, 875 F.2d at 1004-05. Mr. Faulkner's name appears precisely once in the Film, and the Film is, quite obviously, not an advertisement for a collateral commercial product and does not use Mr. Faulkner's name for that purpose. As in *Rogers*, and *Matthews*, and *Young*, both Mississippi law and the First Amendment allow for no "commercial appropriation" claim here.

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendant Sony Pictures Classics Inc. respectfully requests that Plaintiff's Complaint be dismissed, with prejudice, for failure to state a claim on which relief may be granted.

Dated: New York, New York
      December 18, 2012

                                LOEB & LOEB LLP

                                By: *  /s/ Christian D. Carbone     *
                                      Christian D. Carbone
                                      Tom Nolan
                                      345 Park Avenue
                                      New York, New York 10154-1895
                                      (212) 407-4000

                                      Attorneys for Defendant Sony Pictures
                                      Classics Inc.

Dated:  Ridgeland, Mississippi
        December 18, 2012

                            BUTLER, SNOW, O'MARA, STEVENS &
                                CANNADA, PLLC

                            By: */s/ Anita Modak-Truran*
                                Anita Modak-Truran (MSB# 99442)
                                Paul S. Rosenblatt (MSB#104223)
                                1020 Highland Colony Parkway
                                Ridgeland, Mississippi 39157
                                (601) 948-5711345

                            Attorneys for Defendant Sony Pictures
                            Classics Inc.


                    **CERTIFICATE OF SERVICE**

        The undersigned, one of the attorneys for Defendant Sony Pictures Classics Inc. does hereby

certify that he has this day served a true and correct copy of the above and foregoing document by

via the Court's Electronic Case Filing System which sent notification to the following:

        J. Cal Mayo
        Pope S. Mallette
        Paul B. Watkins
        Mayo Mallette PLLC
        5 University Office Park
        2094 Old Taylor Road
        Post Office Box 1456
        Oxford, MS 38655

        ATTORNEYS FOR PLAINTIFF

        SO CERTIFIED, this the 18th day of December, 2012.

                                *s/Paul S. Rosenblatt*
                                PAUL S. ROSENBLATT

NY1150440.8

ButlerSnow 14865348v1

25