IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION


FAULKNER LITERARY RIGHTS, LLC                                    PLAINTIFF

V.                                                      NO. 3:12cv100-M-V

SONY PICTURES CLASSICS, INC., and
JOHN DOE PERSONS OR ENTITIES 1-100                              DEFENDANTS


## PLAINTIFF FAULKNER'S BRIEF IN SUPPORT OF
## ITS RESPONSE TO DEFENDANT'S MOTION TO DISMISS

**J. Cal Mayo, Jr.**
**Pope S. Mallette**
**Paul B. Watkins, Jr.**
**MAYO MALLETTE PLLC**
5 University Office Park
2094 Old Taylor Road
Post Office Box 1456
Oxford, Mississippi  38655
Tel: (662) 236-0055
Fax: (662) 236-0035

# TABLE OF CONTENTS

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.    William Faulkner and *Requiem for a Nun* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    II.    Sony Pictures Classics and *Midnight in Paris* . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    I.    Applicable Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        A.    Rule 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        B.    Fair Use Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    II.    Copyright Infringement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        A.    Substantial Similarity and *De Minimis* Use . . . . . . . . . . . . . . . . . . . . . . . . 8

        B.    Fair Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

            1.    Purpose and Character of Use . . . . . . . . . . . . . . . . . . . . . . . . . 13

                a.    Use does not fall within Section 107's categories. . . . . . . 13

                b.    Use does not constitute transformational "parody". . . . . 13

                c.    Use is commercial in nature. . . . . . . . . . . . . . . . . . . . . . 15

                d.    Sony's good faith cannot be determined. . . . . . . . . . . . . 16

            2.    Nature of Copyrighted Material . . . . . . . . . . . . . . . . . . . . . . . . . 16

            3.    Substantiality of Portion Used . . . . . . . . . . . . . . . . . . . . . . . . . . 17

            4.    Effect of Use on Potential Market or Value . . . . . . . . . . . . . . . . 18

            5.    Factors do not weigh in favor of fair use . . . . . . . . . . . . . . . . . . 19

        C.    Lanham Act and Commercial Appropriation . . . . . . . . . . . . . . . . . . . . . 19

            1.    Faulkner's Claims Exist. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

i

2.    Faulkner's claims survived Mr. Faulkner's death.  . . . . . . . . . . 20

3.    First Amendment does not bar Faulkner's claims.  . . . . . . . . . . 21

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# TABLE OF AUTHORITIES

## CASES:

*Abilene Music, Inc. v. Sony Music Entertainment, Inc.*,
    320 F. Supp.2d 84 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 14-16

*Amazing Spaces, Inc., v. Metro Mini Storage*,
    608 F.3d 225 (5th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Armour v. Knowles*,
    512 F.3d 147 (5th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Atari, Inc. v. North American Philips Consumer Electronic Corp.*,
    672 F.2d 607 (7th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Bourne v. Twentieth Century Fox Film Corp.*,
    602 F. Supp.2d 499 (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Bridgeport Music, Inc. v. UMG Recordings, Inc.*,
    585 F.3d 267 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Brown v. Ames*,
    201 F.3d 654 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Browne v. McCain*,
    612 F. Supp.2d 1125 (C.D. Cal. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Brownmark Films, LLC v. Comedy Partners*,
    682 F.3d 687 (7th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Bruce Lee Enterprises, LLC v. A.V.E.L.A., Inc.*,
    2011 WL 1327137 (S.D.N.Y. March 31, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-20

*Business Management Intern., Inc. v. Labyrinth Business Solutions, LLC*,
    2009 WL 790048 (S.D.N.Y. March 24, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-9

*Burnett v. Twentieth Century Film Corp.*,

iii

491 F. Supp.2d 962 (C.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*C. C. Port., Ltd. v. Davis-Penn. Mtg. Co.,*
61 F.3d 288 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Cairns v. Franklin Mint Co.,*
24 F. Supp.2d 1013 (C.D. Cal. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-21

*Campbell v. Acuff-Rose, Inc.,*
510 U.S. 569 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-14, 16-18

*Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.,*
150 F.3d 132 (2nd Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 18

*Catfish Antitrust Litigation,*
826 F. Supp. 1019 (N.D. Miss. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Chicago Record-Herald Co. v. Tribune Ass'n,*
275 F. 797 (7th Cir. 1921) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-11

*Davis v. Electronic Arts Inc.,*
2012 WL 3860819 (N.D. Cal. March 29, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

*Donald v. Zack Meyer's T.V. Sales and Service,*
426 F.2d 1027 (5th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.,*
688 F. Supp.2d 1148 (D. Nev. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Fuentes v. Mega Media Holdings, Inc.,*
2011 WL 2601356 at *6 (S.D. Fla. June 9, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Harper & Row Publishers, Inc. v. Nation Enters.,*
471 U.S. 539 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 13, 16, 18

*Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc.,*
270 F.3d 298 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-21

*Iowa State Univ. Research Found. Inc. v. American Broadcasting Companies, Inc.,*
621 F.2d 57 (2nd Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Jackson v. Washington Monthly Co.,*
481 F. Supp. 647 (D.D.C. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

iv

*Kaiser v. Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*,
    677 F.2d 1045(5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Katz v. Chevaldina*,
    2012 WL 5245401 (S.D. Fla. Oct. 5, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*LaChappelle v. Fenty*,
    812 F. Supp.2d 434 (S.D.N.Y. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Leadsinger, Inc. v. BMG Music Pub.*,
    512 F.3d 522 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Mainardi v. Prudential Ins. Co. of America*,
    2009 WL 229757 (E.D. Pa. January 30, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*,
    369 F.3d 464 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Parker v. Dufrense*,
    781 F. Supp.2d 379 (W.D. La. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-9

*Parks v. LaFace Records*,
    329 F.3d 437 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-22

*Positive Black Talk, Inc. v. Cash Money Records, Inc.*,
    394 F.3d 357 (5th Cir. 2004) *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010) . 8, 10

*Reed Elsevier, Inc. v. Muchnick*
    559 U.S. 154 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Ringgold v. Black Entertainment Television, Inc.*,
    126 F.3d 70 (2nd Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 18

*Rogers v. Grimaldi*,
    875 F.2d 994 (2nd Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Sandoval v. New Line Cinema Corp.*,
    147 F.3d 215 (2nd Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*State ex rel. Elvis Presley Intern. Memorial Foundation v. Crowell*,
    733 S.W.2d 89 (Tenn. App. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-21

*Stewart v. Abend*,
    495 U.S. 207 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Straus v. DVC Worldwide, Inc.*,
    484 F. Supp.2d 620 (S.D. Tex. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Taylor v. U.S.*,
    2011 WL 4971579 (N.D. Miss. Oct. 19, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Test Masters Educational Services, Inc. v. Singh*,
    428 F.3d 559 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.*,
    338 F.3d 127 (2nd Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Vault Corp. v. Quaid Software Ltd.*,
    847 F.2d 255 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Werlin v. Reader's Digest Association*,
    528 F. Supp. 451 (S.D.N.Y. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Westchester Media v. PRL USA Holdings, Inc.*,
    214 F.3d 658 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-22

*Worth v. Selchow & Righter Co.*,
    827 F.2d 569 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Zacchini v. Scripps-Howard Broadcasting Co.*,
    433 U.S. 562 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

**STATUTES:**

17 U.S.C. § 107 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**OTHER AUTHORITY:**

5 McCarthy on Trademarks and Unfair Competition § 28:42 (2010 ed.) . . . . . . . . . . . . . . . . . . 21

4 Nimmer on Copyright, § 13.03[A][2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

4 Nimmer on Copyright, § 13.03[A][2][a] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

5B Wright & Miller, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3D §§ 1356-57
    (3rd ed. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Restatement (Third) of Unfair Competition, § 47 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

W. Patry & S. Perlmutter, Fair Use Misconstrued: Profit, Presumption
    and Parody, 11 Cardozo Arts & Enter. L. J. 667 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . 15

This matter relates to the use of Plaintiff Faulkner's copyrighted material from William Faulkner's *Requiem for a Nun* ("*Requiem*") in Defendant Sony's movie, *Midnight in Paris* ("*Midnight*"). Specifically, without Faulkner's permission, Sony has used one of Mr. Faulkner's famous quotes ("The past is never dead. It's not even past." (the "Quote")) for the climatic scene in *Midnight*. This misappropriation violates Faulkner's copyright in *Requiem* and the Quote.

Sony makes irreconcilable arguments in support of its request to dismiss Faulkner's copyright infringement claim before answering the Complaint and without any discovery. First, Sony contends that the Quote is a trifle - - a "passing line" of no significance in *Requiem*. Then, in the next breath, Sony argues that its use of the Quote is a parody, implying that the Quote is *Requiem*'s "most distinctive or memorable feature" intentionally used in *Midnight* to evoke the book in the mind of the movie's audience for the purpose of ridicule. Sony is wrong, as Faulkner's famous Quote is certainly not a trifle and *Midnight* does not make a parodic use of it. Instead, unable to create a better expression to communicate the main character's thoughts about the relationship of the past and the present, *Midnight* copies the Quote - - to claimed "great comic effect."

Sony also uses Mr. Faulkner's name in *Midnight*. In essence, Sony makes Mr. Faulkner an off-screen character in an attempt to improperly associate him with the movie. This use violates Faulkner's statutory rights under Section 43(a) of the Lanham Act and its common law publicity rights. Despite Sony's argument to the contrary, these rights have survived Mr. Faulkner's death and descended to his heirs. The claims are not barred, as a matter of law, by the First Amendment.

Sony should have obtained a license from Faulkner before using the Quote and Mr. Faulkner's name in *Midnight*, as it has done with Cole Porter's music and Pablo Picasso's paintings.

Mr. Faulkner's unique expression in the Quote deserves the same respect and protection. This Court should deny Sony's Motion to Dismiss for Failure to State a Claim.

**FACTS**

### I.     William Faulkner and *Requiem for a Nun*

William Faulkner (1897-1962) is considered one of America's greatest writers. A native of north Mississippi, Mr. Faulkner grew up and spent most of his adult life in Oxford, Mississippi. To tell his stories centered on human drama, experiences, relationships and frailties, Mr. Faulkner created various characters living in Jefferson, Yoknapatawpha County, Mississippi. Mr. Faulkner was awarded the Nobel Prize in Literature in 1949 "for his powerful and artistically unique contribution to the modern American novel".[1]

Published in 1951, Mr. Faulkner's *Requiem* explores the relationship of past and present through the life of Temple Drake, a character introduced by Mr. Faulkner in *Sanctuary* (published in 1931), one of his best selling novels. Raped, abducted and taken to a brothel in Memphis where she eventually falls in love with a cohort of her abductor (as told in the original book), Temple is married, living in Jefferson and the mother of two children, including an infant (in the sequel). Using narrative prose, Mr. Faulkner begins the novel with the early history and settlement of fictional Jefferson and intersperses this recounting throughout the book. Mr. Faulkner uses a three-act play to tell Temple's story.

The daughter of a prominent judge in Jackson, Mississippi, and a popular co-ed at the University in Oxford, Temple is tortured by her sordid past and seeks to put it behind her by marrying Gowan Stevens and living a respectable life. However, the brother of her former lover

---

[1]*See* www.nobelprize.org/nobel_prizes/literature/laureates/1949/

2

presents Temple with old love letters, and she conspires to elope with the brother. Nancy Mannigoe, the children's African-American nanny, discovers the plot and suffocates the infant child to force Temple to remain with her family. Through the play, Mr. Faulkner relates the attempt by Gavin Stevens (Gowan's uncle and Nancy's defense counsel during her criminal trial at which she was convicted of murder) to convince Temple to personally plead to the Governor for clemency to prevent Nancy's execution.

Mr. Faulkner repeats the central theme of the relationship of past and present throughout *Requiem*. "[T]he entire novel testifies to the ever-presentness, the inescapability, of the past". N. Polk, Faulkner's *Requiem for a Nun*: A Critical Study, p. 93 (Indiana University Press 1981) (Appendix "A" to this Brief). For example, Gavin tells Gowan (p. 56), "There is no such thing as past." Later, to the Governor and Temple, Gavin describes the past as a promissory note (p. 128):

> [Y]ou – everyone – must, or anyway may have to, pay for your past; that past is something like a promissory note with a trick clause in it which, as long as nothing goes wrong, can be manumitted in an orderly manner, but which fate or luck or chance, can foreclose on you without warning.

Finally, as Temple attempts to distinguish her old self (Temple Drake) from her new self (Mrs. Gowan Stevens), Gavin explains to her (p. 72) the inseparable nature of past and present:

> The past is never dead. It's not even past.

As one critic has noted, Gavin's refusal to accept the distinction, as reflected in this exchange, "is central to the entire novel; this failure is the mainspring of both theme and narrative." Polk, Faulkner's *Requiem*, p. 94 (Appendix "A" to this Brief).

Faulkner owns the copyright to *Requiem* (including the Quote). Faulkner also owns all right, title and interest in the name, image and likeness of Mr. Faulkner. *See* Complaint, ¶ 11 [Doc. #: 1].

## II.   Sony Pictures Classics and *Midnight in Paris*

Sony is a division of Sony Pictures Entertainment, Inc., which is a subsidiary of Sony Corporation of America, a unit of the Japanese parent technology conglomerate Sony Corporation.[2]

In 2011, Sony began distributing *Midnight*, a movie written and directed by Woody Allen. *Midnight* purportedly grossed almost $57 million in domestic revenues (over $150 million worldwide), making it Mr. Allen's highest grossing film and one of Sony's all-time money makers.[3]

Like *Requiem*, *Midnight* explores the relationship of past and present, although through a different medium and from the angle of a romantic modern-day comedy. Gil Pender, a Hollywood writer, yearns to finish his novel (about a man who works in a nostalgia shop named "Out of the Past"). Gil and Inez, his shallow and materialistic fiancée, travel to Paris with her wealthy parents. One night as Gil wanders Paris alone and drunk, a 1920's style car approaches. Gil joins others in the vehicle and realizes that he has traveled back in time to 1920's Paris. Through several nights of time travel, Gil encounters numerous artists, writers, composers and other luminaries, including Cole Porter (who sings and plays the piano) and Pablo Picasso (who is painting a portrait of his lover, Adriana).[4] Gil and Adriana become romantically involved and unexpectedly travel to the 1890's Belle Époque, which Adriana considers the greatest era. While visiting Maxim's and the Moulin Rouge, Gil discovers that the literary giants of the Belle Époque long for the Renaissance.

---

[2]*See* www.sonypictures.com/corp/aboutsonypictures.html; *and* www.sonyclassics.com/about-us.

[3]*See* www.the-numbers.com/market/distributor/Sony-Pictures-Classics; www.hollywoodreporter.com/news/midnight-paris-becomes-woody-allens-212254; *and* www.boxofficemojo.com/movies/?id=midnightinparis.htm.

[4]Sony apparently obtained permission to use Porter's music and Picasso's paintings in *Midnight*. *See* List of *Midnight* Credits (Appendix "B" to this Brief).

4

In the midst of his late-night time travels, Gil's relationship with Inez deteriorates. He wants to share his travels with her, but she has no interest and does not believe him. Instead, Inez becomes enamored with an old friend, Paul, an obnoxious know-it-all who constantly shares his detailed knowledge of the history of Paris but without Gil's true passion or appreciation.

Ultimately, Gil discovers that Inez and Paul are having an affair. In their climatic confrontation, Gil reveals his knowledge of the affair which he gained from Ernest Hemingway. When Inez questions his sanity, Gil tells her:

> The past is not dead! Actually, it's not even past. You know who said that? Faulkner. And he was right. And I met him, too. I ran into him at a dinner party.

(the "*Midnight* Quote"). Gil then ends the relationship with Inez and announces he will remain in Paris. As the movie ends, Gil and Gabrielle, a young french woman who sells antiques and shares an appreciation for 1920's era Paris, walk off together in the rain.

## ARGUMENT

### I.    Applicable Standard

Sony's Motion to Dismiss seeks relief under Rule 12(b)(6). Sony does not alter the standard by submitting copies of *Requiem* and *Midnight*, which are integral to understanding the Complaint's allegations and properly considered in this analysis. Rule 12(b)(6) provides the appropriate framework to consider Sony's contentions concerning *de minimis* infringement (as an element of a copyright infringement claim), the Lanham Act and commercial appropriation,. However, the same is not true for Sony's fair use affirmative defense. The fair use analysis necessarily requires consideration of facts outside the scope of the Complaint, and this Court should refuse to consider it at this time. If the Court considers the affirmative defense, the Court should deny Sony's Motion.

### A.    Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the pleadings.  *See Catfish Antitrust Litigation*, 826 F. Supp. 1019, 1025 (N.D. Miss. 1993) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)); *see also*, 5B Wright & Miller, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3D §§ 1356-57 (3ʳᵈ ed. 2004).  Under Rule 12(b)(6), a court accepts "all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff."  *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004).  To avoid dismissal, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

"Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Id.* at 555.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  On the other hand, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - - but it has not 'show[n]' - - 'that the pleader is entitled to relief.'"  *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

Dismissal for failure to state a claim is appropriate when it appears certain that the plaintiff cannot prove any set of facts that would entitle it to the relief sought.  *See C. C. Port., Ltd. v. Davis-Penn. Mtg. Co.*, 61 F.3d 288, 289 (5ᵗʰ Cir. 1995), *cited in Test Masters Educational Services, Inc. v. Singh*, 428 F.3d 559, 570 (5ᵗʰ Cir. 2005).  "The Court will not accept mere conclusory allegations or legal conclusions masquerading as factual conclusions as true."  *See Kaiser v. Aluminum & Chem.*

*Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982), *cited in Taylor v. U.S.*, 2011 WL 4971579 at *1 (N.D. Miss. Oct. 19, 2011).

### B.     Fair Use Defense

Contrary to Sony's suggestion, courts do not "commonly and increasingly dismiss copyright infringement cases . . . based on fair use" in response to 12(b)(6) motions. *See* Sony Brf., p. 5 [Doc. #: 14]. Sony cites anomalies - - *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687 (7th Cir. 2012), *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522 (9th Cir. 2008), and *Burnett v. Twentieth Century Film Corp.*, 491 F. Supp.2d 962 (C.D. Cal. 2007) - - which this Court should consider in their specific contexts and not as providing general guidance.[5] Fair use is an affirmative defense involving mixed questions of law and fact, and Sony has the burden of proof. *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985); *LaChappelle v. Fenty*, 812 F. Supp.2d 434, 442 (S.D.N.Y. 2011). Due to the "narrow inquiry" at this stage and the "limited access" to the information necessary to fully consider fair use, "courts rarely analyze fair use on a 12(b)(6) motion." *Katz v. Chevaldina*, 2012 WL 5245401 at *2 (S.D. Fla. Oct. 5, 2012) (quoting *Browne v. McCain*, 612 F. Supp.2d 1125, 1130 (C.D. Cal. 2009), and citing *LaChappelle*, 812 F. Supp.2d at 448); *see also Abilene Music, Inc. v. Sony Music Entertainment, Inc.*, 320 F. Supp.2d 84, 88 (S.D.N.Y. 2003) (cautioning against summary judgment (much less 12(b)(6) dismissal) in copyright

---

[5]*Brownmark* and *Burnett* involved parodies. While Sony tries to paint *Midnight*'s copying of Faulkner's famous Quote with a parody brush, it has failed, as discussed below. In *Brownmark*, the appellate court did not consider the fair use defense under Rule 12(b)(6) as a motion to dismiss but under Rule 56 as a summary judgment motion - - a process aided by the plaintiff's complete failure to address the fair use defense before the trial court. 682 F.3d at 692. Finally, in *Leadsinger*, the infringing manufacturer plaintiff sought a declaration that the fair use doctrine protected its karaoke devices from infringement claims by various music publisher defendants. The appellate court agreed with the district court's conclusion that "the allegations in [plaintiff's] complaint do not support a finding of fair use." 512 F.3d at 529.

infringement matters, especially with fair use defenses which turn on case-specific circumstances and balancing of various factual considerations).  The Court should refuse to do so here.

## II.      Copyright Infringement

A plaintiff establishes a claim for copyright infringement by alleging that: (i) it owns a valid copyright, and (ii) the defendant copied constituent original elements of the plaintiff's work. *Amazing Spaces, Inc., v. Metro Mini Storage*, 608 F.3d 225, 251 (5th Cir. 2010).  The second element (copying) requires the plaintiff to show (i) factual copying, and (ii) substantial similarity.  *Id.*; *see also Armour v. Knowles*, 512 F.3d 147, 152 (5th Cir. 2007) (holding that "substantial similarity" requires showing that "the copyrighted expressions in the two works are sufficiently alike that the copyright to the original work has been infringed").

Faulkner owns a valid copyright to *Requiem*.  *See* Complaint, ¶ 11 [Doc. #: 1].  As for the act of copying, "direct evidence is rarely available".  *E.g.*, *Positive Black Talk, Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 368 (5th Cir. 2004), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010).  Here, however, *Midnight*'s copying includes a direct reference to Mr. Faulkner, and Sony admits taking the *Midnight* Quote from *Requiem*.[6]  *See* Sony Brf., p. 1 [Doc. #: 14].  Factual copying is not an issue.  Thus, "substantial similarity" provides the only remaining hurdle to Faulkner stating a claim for copyright infringement.

### A.      Substantial Similarity and *De Minimis* Use

---

[6]Sony tries to soften its violation by defining the *Midnight* Quote as a "paraphrase" of the Quote.  Use of a paraphrase does not absolve Sony.  *See Donald v. Zack Meyer's T.V. Sales and Service*, 426 F.2d 1027, 1030 (5th Cir. 1970) ("[I]n copyright law, paraphrasing is equivalent to outright copying."), *cited in Parker v. Dufrense*, 781 F. Supp.2d 379, 386 (W.D. La. 2011).

A plaintiff demonstrates "substantial similarity" by showing (i) that the defendant copied protected expression from the original work, and (ii) that the amount copied was "more than de minimis". *Business Management Intern., Inc. v. Labyrinth Business Solutions, LLC*, 2009 WL 790048 at *7 (S.D.N.Y. March 24, 2009) (citing *Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 131 (2nd Cir. 2003)). This assessment requires a case-by-case analysis, "as there are no bright-line rules for what constitutes substantial similarity." *Business Management*, 2009 WL 790048 at *7 (quoting *Sandoval v. New Line Cinema Corp.*, 147 F.3d 215, 217 (2nd Cir. 1998)). The Quote, an original creation by Mr. Faulkner, constitutes a protected expression, a point which Sony does not contest. Instead, Sony argues that this Court should determine as a matter of law that *Midnight*'s use of the Quote was a *de minimis* taking. *See* Sony Brf., pp. 6-8 [Doc. #: 14].

Sony focuses on the quantitative significance of the Quote - - describing it as a "nine word paraphrase". *Id.* at p. 8.[7] In doing so, Sony ignores the general rule that "transgression in . . .

_____

[7]None of the decisions upon which Sony relies (*see* Sony Brf., pp. 7-8 [Doc. #: 14]) involves rulings on 12(b)(6) motions or is otherwise particularly helpful to Sony's contentions in the current analysis. In *Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255, 267-68 (5th Cir. 1988) (stipulated final judgment after district court denied preliminary injunction), concerning a derivative work in a computer software program, the Fifth Circuit concluded that the alleged infringing derivative software program served a function completely different than the copyrighted work and thus lacked substantial similarity. In *Werlin v. Reader's Digest Association*, 528 F. Supp. 451, 464 (S.D.N.Y. 1981) (full trial on merits), concerning two non-fiction articles about a child with Down's Syndrome, the district court recognized the importance of qualitative significance but concluded that two distinct sentences duplicated in the second article were immaterial to the first article. *Jackson v. Washington Monthly Co.*, 481 F. Supp. 647, 650-51 (D.D.C. 1979) (cross-motions for summary judgment), was decided under the common law of the District of Columbia. In *Straus v. DVC Worldwide, Inc.*, 484 F. Supp.2d 620, 641 (S.D. Tex. 2007) (cross-motions for partial summary judgment), involving use of an Arnold Palmer photograph in a television advertisement, the district court concluded that the photograph was out of focus and not identifiable as a specific photograph. Finally, in *Parker*, 781 F. Supp.2d at 386-87 (cross-motions for summary judgment), involving a manuscript and a short story about the same event, the district court concluded that the infringing short story copied a few words and ideas (rather than word-for-word) which were either facts (and not

9

unauthorized appropriation [of copyrighted material] is not to be neutralized on the plea that 'it is such a little one.'" *Chicago Record-Herald Co. v. Tribune Ass'n*, 275 F. 797, 799 (7th Cir. 1921), *cited in* 4 Nimmer on Copyright, § 13.03[A][2][a], at 13-55. Sony also blatantly ignores the other (more important) part of the equation: the qualitative significance of the Quote to *Requiem*.

An analysis of "substantial similarity must take into account the qualitative importance of the copied material to the plaintiff's work . . . ." *See Positive Black Talk*, 394 F.3d at 373 n. 12. As the Fifth Circuit Court of Appeals has recognized:

> The quantitative relation of similar material to the total material contained in plaintiff's work is certainly of importance. However, even if the similar material is quantitatively small, if it is qualitatively important, the trier of fact may properly find substantial similarity. . . . The trier must ultimately determine the importance of that material that is common to both parties' work.

*Id.*, citing 4 Nimmer, § 13.03[A][2], at 13-47 to -50; *see also Chicago Record-Herald*, 275 F. at 799 ("Whether the appropriated publication constitutes a substantial portion of that which is copyrighted cannot be determined alone by lines or inches which measure the respective articles.").

Substantial similarly does not require a conclusion that "the original [*Requiem*] could be recreated from the allegedly infringing copy [*Midnight*] . . . ." *Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.*, 150 F.3d 132, 139 (2nd Cir. 1998) (affirming judgment for producers of television series *Seinfeld* against publishers of trivia quiz book). Stated another way, the question is "whether a substantial portion of the protectable material in [Faulkner's] work was appropriated – not whether a substantial portion of [Sony's] work was derived from [Faulkner's] work." *Worth v. Selchow & Righter Co.*, 827 F.2d 569, 570 n. 1 (9th Cir. 1987) ("[A]ssuming that particular

---

protected by copyright) or otherwise unimportant to the manuscript.

material is copyrightable, a determination of the qualitative importance of the material to the plaintiff's work is more significant than a quantitative calculation of the portion allegedly appropriated by the defendant."). "Infringement may be found where the similarity relates to matter which constitutes a substantial portion of plaintiffs' work – *i.e.*, matter which is of value to plaintiffs." *Atari, Inc. v. North American Philips Consumer Electronic Corp.*, 672 F.2d 607, 619 (7th Cir. 1982), *cited in Mainardi v. Prudential Ins. Co. of America*, 2009 WL 229757 at *5 (E.D. Pa. January 30, 2009); *see also Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 585 F.3d 267, 272 and 274-77 (6th Cir. 2008) (upholding infringement verdict arising from use of "Bow Wow" refrain, repetition of word "dog" and rhythmic panting); *Iowa State Univ. Research Found. Inc. v. American Broadcasting Companies, Inc.*, 621 F.2d 57, 61 (2nd Cir. 1980) (upholding verdict of infringement for using 2.5 minutes of 28 minute copyrighted film).

In this case, the Quote describes the essence of *Requiem*: there is no such thing as past, whether for Jefferson or Temple Drake. The events of the past (for better or worse) cannot be discarded and forgotten; the history of mankind just as the personal history of Temple Drake shapes and forms human relations and conduct. As one critic has noted, the expression in the Quote is "central to the entire novel" - - the "mainspring of both theme and narrative" - - describing the "inescapability" of the past. Polk, Faulkner's *Requiem*, pp. 93-94 (Appendix "A" to this Brief). That Mr. Faulkner uniquely expressed this concept in the Quote is manifested by its fame,[8] fame

---

[8]Sony readily admits the notoriety garnered by Mr. Faulkner's Quote. *See* Sony Venue Brf., p. 1 [Doc. #: 15] ("famous nine-word quote from William Faulkner").

which led current President Barack Obama to use it in his most celebrated campaign speech addressing America's history of race relations ("A More Perfect Union").[9]

In describing the Quote (*see* Sony Brf., p. 7 [Doc. #: 14]), Sony cites the legal maxim *de minimis non curat lex* – "the law does not concern itself with trifles".  *See, e.g., Ringgold v. Black Entertainment Television, Inc.,* 126 F.3d 70, 74-76 (2nd Cir. 1997) (discussing concept of *de minimis* in context of copyright law).  Mr. Faulkner's famous Quote is no trifle.  It is significant to *Requiem* and valuable to Faulkner.  At the least, Faulkner has sufficiently stated a claim for copyright infringement.

### B.      Fair Use[10]

Sony alternately describes the *Midnight* Quote, on the one hand, as a comic effect or a joke, and, on the other hand, as a parody. *See* Sony Brf., pp. 1 and 13-14 [Doc. #: 14].  While courts have viewed parody as a type of use which will sometimes excuse otherwise actionable infringement, the same is not true for use of a protected expression as simple satire or as a joke.  Mr. Allen's copying of Mr. Faulkner's famous Quote in Gil's comment to Inez might (or might not) have achieved a "great comic effect", but misappropriating a protected expression to get a laugh from the movie audience does not immunize Sony from copyright liability.  And the comment does not constitute parody.

---

[9]As one court described a reporter's choice of words, Mr. Faulkner's timeless expression "reveals a peculiar power of portrayal, and a felicity of wording and phrasing, well calculated to seize and hold the interest of the reader . . . ."  *Chicago Record-Herald*, 275 F. at 799.

[10]As discussed above, this Court should not engage in a fair use analysis at this early stage of the litigation.  Instead, the Court should deny Sony's Motion without prejudice.

Traditionally, courts have defined fair use as "a privilege in others than the owner of the copyright to use the copyrighted material in a reasonable manner without his consent." *Harper*, 471 U.S. at 549 (quoting H. Ball, Law of Copyright and Literary Property 260 (1944)). Section 107 of the Copyright Act has codified the common law and provides four non-exclusive factors to consider when analyzing fair use. 17 U.S.C. § 107; *see* Sony Brf., pp. 9-10 [Doc. #: 14]. Fair use requires a case-by-case determination using a tailored analysis, not application of bright-line rules. *Harper*, 471 U.S. at 549; *Campbell v. Acuff-Rose, Inc.*, 510 U.S. 569, 577 (1994). A mixed question of fact and law, fair use requires a court to determine each case on its own facts. *Harper*, 471 U.S. at 560.

### 1. Purpose and Character of Use

Courts will typically look at four issues to determine if a use of copyrighted material is the type copyright is intended to prohibit or the type that tends to promote the goals of advancing "the Progress of Science and the useful Arts":

1) whether use matches one of Section 107's listed categories;
2) whether use is transformative;
3) whether use is commercial; and
4 whether user has acted in good faith.

*See Fuentes v. Mega Media Holdings, Inc.*, 2011 WL 2601356 at *6 (S.D. Fla. June 9, 2011). The answers to these questions make clear copyright law is intended to prohibit Sony's unauthorized use of the Quote in *Midnight*. The first factor weighs in favor of Faulkner.

### a. Use does not fall within Section 107's categories.

Section 107 specifies that "fair use" of copyrighted materials for "purposes of criticism, comment, news reporting, teaching . . ., scholarship, or research" do not constitute copyright infringement. Here, Sony's use of the Quote does not fall into any of the enumerated categories.

13

### b.    Use does not constitute transformational "parody".

Sony suggests that its use of the Quote constitutes a parody.  At other times, Sony contends that the use was a joke or comic relief.  The use of the Quote was not parodic.  Whether the use actually achieves comic relief is of no moment, as fair use does not protect jokes as it does parody.

Citing modern dictionaries, the United States Supreme Court defines "parody" as a "literary or artistic work that imitates the characteristic style of an author or work for comic effect or ridicule" or as a "composition in prose or verse in which the characteristic turns of thought and phrase in an author or class of authors are imitated in such a way as to make them appear ridiculous." *Campbell*, 510 U.S. at 580.  But, parody differs from mere satire and comedy:

> For the purposes of copyright law, the nub of the definitions, and the heart of any parodist's claim to quote from existing material, is the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works.  If, on the contrary, the commentary has no critical bearing on the substance or style of the original composition, which the alleged infringer merely uses to get attention or to avoid the drudgery in working up something fresh, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of its commerciality, loom larger.  Parody needs to mimic an original to make its point, and so has some claim to use the creation of its victim's (or collective victims') imagination, whereas satire can stand on its own two feet and so requires justification for the very act of borrowing.

*Id.*, 510 U.S. at 580-81.  Merely appropriating material from an existing work "for humorous effect", in a manner that does not direct "criticism or ridicule at the copied work itself", lacks parody's need to copy material from the original work to make its point and does not get parody's allowances when considering the fair use factors.  *Abilene Music*, 320 F. Supp.2d at 91; *see also Campbell*, 510 U.S. at 597 (Kennedy, J., concurring) ("It is not enough that the parody use the original in a humorous fashion; however creative that humor may be.").

14

Sony makes no effort to parody *Requiem* through *Midnight*.[11]  Sony has characterized the novel as "obscure" (*see* Sony Brf., p.1 [Doc. #: 14]), so a single reference would not likely "evoke" the work in the movie audience's mind.  Nor does Sony attempt to parody generally Faulkner or his writing style.  *Midnight* is not about Faulkner, his works or *Requiem*.  At best for Sony, the Quote in *Midnight* serves a purpose akin to use of the song *Wonderful World* in the movie *Good Morning, Viet Nam* when played along scenes of wartime violence as an ironic satirical device - - - the kind of use "which typically requires licensing".  *Abilene Music*, 320 F. Supp.2d at 92 (contrasting Ghostface Killah's song parody with movie use); *see also Bourne v. Twentieth Century Fox Film Corp.*, 602 F. Supp.2d 499, 504-08 (S.D.N.Y. 2009) (distinguishing  satire and parody in context of "Family Guy" episode's use of song "I Need a Jew" as parody of "When You Wish Upon a Star").

Sony's use may be funny, and it may provide comic relief.  But it is no parody.  Sony's use is the kind "which typically requires licensing".  Any transformation from *Midnight*'s use of the Quote is slight to non-existent.  Mr. Allen, needing a phrase to capture the relationship between past and present in Gil Pender's world (real or imagined), could think of nothing better so he copied Mr. Faulkner's unique expression.  While it might achieve a desired result, *Midnight*'s use of the Quote in a different setting by a different character does not transform the meaning of the Quote or add anything of benefit to society.  If it did, any "artistic use" would qualify as "transformational use".

### c.     Use is commercial in nature.

---

[11]Even if Sony's use is construed as a parody, such a determination does not create a presumption of fairness or end the fair use analysis.  *See Campbell*, 510 U.S. at 581.

15

Sony's use of the Quote in *Midnight* is commercial in nature, even though *Midnight* provides entertainment. *See* W. Patry & S. Perlmutter, Fair Use Misconstrued: Profit, Presumption and Parody, 11 Cardozo Arts & Enter. L. J. 667, 684 (1993) ("Where the defendant's use could be characterized as entertainment, courts have tended to find that its commercial nature weighs the first factor against fair use."); *see also Stewart v. Abend*, 495 U.S. 207, 237 (1990) (upholding finding that Hitchcock movie was commercial rather than educational). "The crux of the profit/nonprofit distinction" is "whether the user stands to profit from the exploitation of the copyrighted material without paying the customary price." *Harper*, 471 U.S. at 562.

While the Supreme Court in *Campbell* warned against giving dispositive weight to the commercial nature of a use without considering the other factors, the Court also recognized that 2 Live Crew's song would infringe Acuff-Rose's copyright in "Pretty Woman" under the Copyright Act "but for a finding of fair use through parody." 510 U.S. 569 at 574. In other words, the parodic use was critical to the Court's fair use analysis. *See also Abilene Music*, 320 F. Supp.2d at 89 (holding that determination of parody under first factor diminishes import of other three factors in fair use analysis). Sony's use here is no parody, so it does not get a "parody pass".

### d. Sony's good faith cannot be determined.

Faulkner has no way to determine if Sony has acted in good faith while using the Quote in *Midnight*. The parties have yet to engage in discovery. However, Sony did apparently obtain permission to use material protected by copyrights held by other "characters" in Midnight, such as Cole Porter and Pablo Picasso. *See* List of Movie Credits (Appendix "B" to this Brief). In addition,

Midnight's credits indicate that Loeb & Loeb (defense counsel in this litigation) provided legal counsel to Sony, presumably to advise on copyright license and related issues.[12]

### 2.      Nature of Copyrighted Material

Sony acknowledges, as it must, that Requiem is entitled to the core protections of copyright law as a creative and expressive work. *See* Sony Brf., p. 15 [Doc. #: 14].  Sony then equivocates, attempting to stretch the Supreme Court's decision in *Campbell* to new bounds in an effort to relegate this second factor to relative insignificance.  The *Campbell* Court did indicate that parodies "invariably copy publicly known, expressive works."  510 U.S. at 586.  Contrary to Sony's suggestion that this comment could have broader implications for other types of "fair use", the Court's observation obviously relates to exactly what it states: parodists typically copy expressive works.  As Sony's use of the Quote is not parody, the observation has no relevance here.  This factor weighs against fair use.

### 3.      Substantiality of Portion Used[13]

Sony's discussion of this factor (*see* Sony Brf., pp. 15-16 [Doc. #: 14]) highlights the irreconcilable nature of its two arguments.  Sony suggests that the Quote is "a passing line, not the conceptual 'heart'" of *Requiem*.[14]  Yet, Sony otherwise tells us that the Quote is a parody, which necessarily requires use of a substantial portion of copyrighted material to achieve its desired end:

---

[12]Irwin J. Tenenbaum, Esq., in the Los Angeles office of Loeb & Loeb apparently served as lead counsel for the firm, based on the information currently available to Faulkner. *See* www.imdb.com/title/tt1605783/fullcredits#cast.

[13]Faulkner refers the Court to Section II.A., above, which discusses the qualitative significance of the Quote to *Requiem*.

[14]At least one noted Faulkner scholar has taken away a different view of *Requiem* and the significance of the Quote.  Polk, Faulkner's *Requiem*, pp. 93-94 (Appendix "A" to this Brief)

> Parody's humor, or in any event its comment, necessarily springs from recognizable allusion to its object through distorted imitation. Its art lies in the tension between a known original and its parodic twin. When parody takes aim at a particular original work, the parody must be able to "conjure up" at least enough of that original to make the object of its critical wit recognizable. What makes for this recognition is quotation of the original's most distinctive or memorable features, which the parodist can be sure the audience will know.

*Campbell*, 510 U.S. at 588 (citations omitted). So which is it? Is the Quote a trifle or *Requiem*'s "most distinctive or memorable feature"? The answer is that the Quote is no parody and, though small in quantitative comparison, is "the heart of the book", which weighs against fair use. *See Harper*, 471 U.S. at 564-65 (agreeing with district court's conclusion as to qualitative significance of verbatim quotes in original manuscript). This factor weighs against fair use.

### 4.      Effect of Use on Potential Market or Value

Sony argues that Faulkner has conceded this point by omitting allegations in its Complaint about the impact of Sony's infringement on the market for *Requiem*. Then, claiming the parody pass, Sony suggests that existence of a licensing market is not relevant. Sony's analysis is off base.

First, fair use is an affirmative defense. The rules of procedure do not require Faulkner to anticipate and plead against Sony's defenses. As the *Campbell* Court noted, Sony (not Faulkner) will "have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets." 510 U.S. at 590. Sony's suggestion that Faulkner had some obligation to affirmatively plead the market harm highlights the problem with resolving Sony's fair use defense in a 12(b)(6) motion. The parties have not engaged in discovery, and Faulkner cannot submit any affidavits. However, Faulkner fully anticipates submitting evidence that it routinely enters into licensing agreements for its copyrighted materials, including *Requiem*, and that Sony's infringement,

left unabated, will adversely impact Faulkner's ability to exploit for its financial benefit its property rights in *Requiem* and the Quote. *See, e.g., Ringgold*, 126 F.3d at 81 (holding that fourth factor favors copyright holder who can show a "traditional, reasonable, or likely to be developed market" for licensing); *see also Castle Rock*, 150 F.3d at 145 (discussing need to consider impact of infringement on market for derivative works in context of trivia game based on television show).

Second, as discussed, *Midnight*'s use of the Quote is not a parody. Therefore, the parody decision cited by Sony is of no moment in this analysis. *See* Sony Brf., p.17 n.4 [Doc. #: 14].

This factor is, at best for Sony, neutral at this time.

### 5.    Factors do not weigh in favor of fair use.

This litigation has only just begun. Sony has not yet answered, and the parties have not exchanged any discovery. The Court does not yet have all the information needed to conduct a full fair use analysis. However, considering the fair use factors in the light of available information, Sony will not likely prevail on its fair use affirmative defense. At the least, sufficient fact issues exist which preclude summary disposition in Sony's favor.

### C.    Lanham Act and Commercial Appropriation

Faulkner's Lanham Act and commercial appropriation claims arise from Sony's unauthorized use of Mr. Faulkner's name in *Midnight*. Sony contends that neither of these rights exists. Sony then argues that the rights did not survive Mr. Faulkner's death. Finally, Sony suggests that the non-existent rights which did not survive Mr. Faulkner's death must give way to First Amendment concerns. Sony is wrong on all counts. This Court should deny Sony's Motion to Dismiss.

### 1.    Faulkner's Claims Exist.

The Lanham Act is not limited in scope to disputes between competitors about their commercial products.  The Act also "permits celebrities to vindicate property rights in their identities against allegedly misleading commercial use by others." *Parks v. LaFace Records*, 329 F.3d 437, 445 (2003) (recognizing existence of right for civil rights icon Rosa Parks).  Celebrities "possess an economic interest in their identities akin to that of a traditional trademark holder." *Id.*; *see also Bruce Lee Enterprises, LLC v. A.V.E.L.A., Inc.*, 2011 WL 1327137 at *4 (S.D.N.Y. March 31, 2011) (recognizing existence of right for martial artist and film star Bruce Lee).  Sony offers no reason why this Court should not similarly recognize Faulkner's rights under the Lanham Act.

The tort of misappropriation protects a person from the unauthorized use of a his or her "name, image or likeness."  *See Brown v. Ames*, 201 F.3d 654, 657-58 (5th Cir. 2000) (Texas law).  The rights protected by the right of publicity (*persona* or image) are distinct from those protected by copyright (writings).  *Id.* at 658.  The right of publicity is also distinct from the right of privacy, as recognized by the United States Supreme Court.  *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 571-73 (1977) (distinguishing false light right of privacy and right of publicity); *see also State ex rel. Elvis Presley Intern. Memorial Foundation v. Crowell*, 733 S.W.2d 89, 94-95 (Tenn. App. 1987) (reciting history of development of publicity rights jurisprudence and observing that "courts in other jurisdictions uniformly hold that the right of publicity should be considered as a free standing right independent from the right of privacy").  Privacy rights protect self esteem and dignity while publicity rights protect pecuniary interests in commercial exploitation of celebrity identity.  *Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc.*, 270 F.3d 298, 324-26 (6th Cir. 2001) (holding that privacy and publicity rights "protect fundamentally different interests and must

20

be analyzed separately"). Sony offers no reason why a Mississippi court would ignore the numerous jurisdictions which have concluded that celebrities have a common law publicity right.[15]

### 2. Faulkner's claims survived Mr. Faulkner's death.

The property rights in a celebrity's identity survive the death of the celebrity under the Lanham Act. *Bruce Lee Enterprises*, 2011 WL 1327137 at *5. Courts that have considered the issue have expressly reached that conclusion and others have done so implicitly. *See Cairns v. Franklin Mint Co.*, 24 F. Supp.2d 1013, 1032-33 n.15 (C.D. Cal. 1998) (holding that Estate of Diana, Princess of Wales, could pursue Lanham Act claim and collecting cases).

As for common law publicity rights, "the overwhelming majority rule . . . is that the right of publicity is descendible property and has an unconditional postmortem duration." *Herman Miller*, 270 F.3d at 326; *see also* 5 McCarthy on Trademarks and Unfair Competition § 28:42 (2010 ed.) (distinguishing postmortem duration of privacy rights and publicity rights). Permitting publicity rights to survive death and descend like other personal property serves numerous policy concerns. *See, e.g., Elvis Presley Intern.*, 733 S.W.2d at 97-99 (discussing various policy considerations including right of testamentary distribution, unjust enrichment and value of contract rights related to use of a celebrity's name and likeness). A Mississippi court faced with the question would most certainly recognize common law publicity rights as personal property descendible at death.

---

[15]Publicity right claims differ from Lanham Act claims as the former do not require evidence that a consumer is likely to be confused. *See, e.g., Parks*, 329 F.3d at 460.

21

### 3. First Amendment does not bar Faulkner's claims.

Sony's entertainment features in *Midnight* certainly receive First Amendment protections. However, "these protections are not absolute." *Davis v. Electronic Arts Inc.*, 2012 WL 3860819 at *7 (N.D. Cal. March 29, 2012). The First Amendment does not give "*carte blanche*" to every person who cries "artist". *Parks*, 329 F.3d at 447.

To balance First Amendment and Lanham Act interests, the Fifth Circuit Court of Appeals has adopted the test set forth in *Rogers v. Grimaldi*, 875 F.2d 994 (2nd Cir. 1989). *See Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 664-65 (5th Cir. 2000). Under this two-pronged test, a Lanham Act claim must give way to the First Amendment unless the alleged misuse of a celebrity's identity "has no artistic relevance to the underlying work" or, if it has some relevance, if the alleged misuse "explicitly misleads as to the source or the content of the work." *Id.* at 664. Determining whether the use misleads as to source or content requires application of the "likelihood of confusion" test, with the added necessity of finding that the likelihood of confusion must be "particularly compelling" to outweigh First Amendment concerns. *Id.* at 665. Here, the relevance of using Mr. Faulkner's name in the movie is certainly debatable. The apparent purpose was to connect Mr. Faulkner and the Quote with the 1920's. However, the Quote did not exist until the 1950's. Regardless, at this stage, the Court cannot possibly consider the relevant factors and make the findings of fact required for a likelihood of confusion analysis, which includes, among other things, determinations as to Sony's intent and as to evidence of actual confusion. *Id.*

As for the commercial appropriation claim, the First Amendment's scope is not so broad as to limit common law publicity rights to merely preventing use of a person's name or likeness in an advertisement, as courts generally recognize that such claims include the right to prohibit

22

unauthorized uses on or as part of a product. *See, e.g., Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*, 688 F. Supp.2d 1148, 1169-70 (D. Nev. 2010) (recognizing claim against art publisher for use of image on t-shirts). For example, the First Amendment does not necessarily immunize a news broadcast of a performer's act. *Zacchini*, 433 U.S. at 569-579. It also does not immunize a record producer from using a celebrity's name in a song title. *Parks*, 329 F.3d at 460-61. The ultimate question is whether a reasonable person could find that a name was used "solely to attract attention to a work that is not related to the identified person." *Id.* at 461 (citing Restatement (Third) of Unfair Competition, § 47).

Here, Sony used Mr. Faulkner's name only once. However, that use came at a critical point in *Midnight*, a movie which otherwise has no connection to Mr. Faulkner. And Sony appropriated Mr. Faulkner's name in the "very activity by which [he] acquired his reputation in the first place" - - - expressing his unique and famous Quote (albeit in temporal error). *See, e.g., Davis*, 2012 WL 3860819 at **3-5 (denying motion to dismiss former football player's claims for violation of publicity rights related to football video game). A reasonable person could conclude that Sony used Mr. Faulkner's name (in essence making him an off screen character) as an attraction.

## CONCLUSION

Sony's arguments sound furiously advocative: Faulkner's position is "extreme" and "absurd"; Faulkner's Quote is a "passing line" or a trifle; to afford Faulkner any property interest in Mr. Faulkner's identity would violate Sony's First Amendment rights. Upon analysis, however, Sony's arguments lack any legal significance. This Court should deny Sony's Motion to Dismiss.

THIS, the 22nd day of January, 2013.

Respectfully submitted,

FAULKNER LITERARY RIGHTS, LLC

*J. Cal Mayo, Jr.*
J. CAL MAYO, JR. (MB NO. 8492)
POPE S. MALLETTE (MB NO. 9836)
PAUL B. WATKINS, JR. (MB NO. 102348)
ITS ATTORNEYS

OF COUNSEL:

MAYO MALLETTE PLLC
5 University Office Park
2094 Old Taylor Road
Post Office Box 1456
Oxford, Mississippi 38655
Tel: (662) 236-0055
Fax: (662) 236-0035

**CERTIFICATE OF SERVICE**

I, J. Cal Mayo, Jr., one of the attorneys for Plaintiff, do certify that I have electronically filed the foregoing document with the Clerk of the Court using the ECF system which sent notification of such filing to all attorneys of record.

THIS, the 22nd day of January, 2013.

_J. Cal Mayo, Jr._
J. CAL MAYO, JR.