IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI

**FAULKNER LITERARY RIGHTS, LLC**                                         **PLAINTIFF**

**V.**                                                                                         **CASE NO. 3:12cv100**

**SONY PICTURES CLASSICS INC.**
**and JOHN DOE PERSONS OR ENTITIES**                              **DEFENDANTS**

**MEMORANDUM OPINION**

Presently before the court is the motion of the defendant, Sony Pictures Classics, Inc. ("Sony"), seeking dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). The plaintiff, Faulkner Literary Rights, LLC ("Faulkner") has responded in opposition. The court has viewed Woody Allen's movie, *Midnight in Paris*, read the book, *Requiem for a Nun*, and is thankful that the parties did not ask the court to compare *The Sound and the Fury* with *Sharknado*. Further, the court has thoroughly considered the filings and relevant law. The motion is due to be granted.

At issue in this case is whether a single line from a full-length novel singly paraphrased and attributed to the original author in a full-length Hollywood film can be considered a copyright infringement. In this case, it cannot.

Faulkner has alleged claims under the Lanham Act, 15 U.S.C. § 1125 and the Copyright Act, 17 U.S.C. §§ 101, *et seq*, arising out of Sony's use of a quote from revered literary giant William Faulkner's *Requiem for a Nun* ("*Requiem*") in the film, *Midnight in Paris* ("*Midnight*"), directed by Woody Allen. The present motion requires this court's consideration of several issues: (1) whether the affirmative defense raised to the copyright infringement claim can properly be considered on a motion to dismiss; (2) whether the use in *Midnight* is justified under

1

a *de minimis* copyright analysis; (3) if the alleged infringement is not *de minimis*, whether or not it constitutes fair use; (4) whether Faulkner's Lanham Act claim has merit.

### 1. Facts

The dispute centers on the *Requiem* quote of county attorney Gavin Stevens, "The past is never dead. It's not even past." *Midnight* contains the quote, "The past is not dead. Actually, it's not even past. You know who said that? Faulkner, and he was right. I met him too. I ran into him at a dinner party." Notably, Faulkner has not provided any more facts in his complaint than descriptions of the two works, a jurisdiction and venue statement, and threadbare recitals of elements.

### a. Midnight in Paris

*Midnight* is a film set in modern-day Paris that follows the adventures of Gil Pender, a Hollywood screenwriter with literary aspirations. Pender is on vacation with his fiancée, Inez, and her parents. Gil decides to walk home to their hotel from a roof-top wine tasting as Inez opts for an evening of dance with a friend, Paul Bates. Gil loses his way, and an antique car pulls up at the stroke of midnight, and the passengers, laughing and drinking champagne, invite Gil to join them. They drive to a party where Cole Porter is performing and Zelda and F.Scott Fitzgerald are in attendance.

The following afternoon, Gil and Inez join Paul and Carol Bates on an excursion to the palace of Versailles. Gil discusses his novel with the pedantic, pontificating Paul Bates, who coins the term, "Golden Age Thinking, the erroneous notion that a different time period is better than the one one's living in. Ya know, it's a flaw in the romantic imagination of those people who find it difficult to cope with the present". "Golden Age Thinking" pervades the film, both in plot and theme.

Gil returns to the streets each night of the vacation at midnight to return to 1920's Paris, pursuing counsel for a novel he has drafted. He obtains such counsel from none other than Gertrude Stein and Ernest Hemingway. He meets Gertrude Stein at her apartment, where Pablo Picasso is painting an abstract portrait of his mistress, Adriana. Gertrude Stein recites the first lines of Gil's novel: "'Out of the Past' was the name of the store, and its products consisted of memories. What was prosaic and even vulgar to one generation had been transmuted by the mere passing of years to a status at once magical and also camp." The opening lines are gripping to Adriana, who remarks, "The past has always had a great charisma for me."

Gil and Adriana ultimately develop a platonic relationship and visit 1890's Paris. Just as Gil is disenchanted by present day and longs for the 1920s, Adriana is discontent with the 1920s and pines for La Belle Époque, and the artists of La Belle Époque yearn for the Renaissance. During their visit, Adriana and Gil have a disagreement as to whether they should stay in the 1890s or return to the 1920s. Adriana wants to remain in La Belle Époque, "the most beautiful era Paris has ever known." Gil responds, "Yeah but what about the 20s and the Charleston, and the Fitzgeralds, and the Hemingways? I mean I love those guys." Adriana rejoins, "But it's the present. It's dull." Gil acknowledges that his desire to live a happier life in the past is an illusion. Gil and Adriana separate.

The following afternoon, Gil accuses Inez of carrying on an affair with Paul Bates. Inez, incredulous, asks where Gil might have gotten such an idea. Gil responds that he got the idea from Hemingway, Fitzgerald, Gertrude Stein and Salvador Dali, a notion Inez ridicules because they are all dead. In response, Gil states, "The past is not dead. Actually, it's not even past. You know who said that? Faulkner, and he was right. And I met him too. I ran into him at a dinner party."

3

b. **Requiem for a Nun**[1]

William Faulkner wrote *Requiem for a Nun*, a cross-genre between a novel and a three-act play, as a sequel to his novel, *Sanctuary*. The story provides a history of the fictional Yoknapatawpha County, Mississippi. Temple Drake's nanny, Nancy, has been sentenced to death for the murder of Temple's child. Nancy's defense attorney, Gavin Stevens, visits Temple to ask that she plead clemency for Nancy since Temple herself is not without fault in her child's death. In response, Temple resists and distances herself from her past, stating that she is now Mrs. Gowan Stevens, not Temple Drake. Gavin Stevens retorts, "The past is never dead. It's not even past."

*Requiem* contains other similar references to the past. Gavin Stevens states, speaking to Gowan, that "There's no such thing as past either." Later in the book, Gavin describes the past as a promissory note:

> It was as though she realised for the first time that you – everyone – must, or anyway may have to, pay for your past; the past is something like a promissory note with a trick clause in it which, as long as nothing goes wrong, can be manumitted in an orderly manner, but which fate or luck or chance, can foreclose on you without warning.

### 2. Legal Standard

Sony does not contest the facts alleged in Faulkner's complaint.[2] Thus, while the court will proceed under Rule 12(b)(6), its decision is the same under Rule 56. *See* Fed. R. Civ. P. 56. "Motions to dismiss are viewed with disfavor and are rarely granted." *Test Masters Educ. Servs.*

---

[1] The court disagrees with Sony's characterization of *Requiem* as being "relatively obscure". Nothing in the Yoknapatawpha canon is obscure. Having viewed the two works at issue in this case, the court is convinced that one is timeless, the other temporal.

[2] Both the film and the novel are properly before the court as attached to the motion to dismiss. *See Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004)("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.").

*v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005).[3] A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the legal sufficiency of the complaint and raises an issue of law. When reviewing a motion to dismiss, the court "accepts all well pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Guidry v. American Pub. Life Ins. Co.*, 512 F.3d 117, 180 (5th Cir. 2007). However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)(cting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

"Factual allegations must be enough to raise a right to relief above the speculative level, on assumption that all allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555. A complaint will be dismissed unless there are "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. A plaintiff's complaint must nudge his claims "across the line from conceivable to plausible." *Id*. Determining whether a complaint states a plausible claim for relief is a context-specific task that requires the court to draw on its judicial experience and common sense. *Iqbal*, 556 U.S. at 679 (2009).

### 3. Analysis

a. **Copyright Act**

1. *De Minimis*

"A copyright infringement claim requires proof of (1) ownership of a valid copyright and (2) actionable copying, which is the copying of constituent elements of the work that are copyrightable." *Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 576 (5th Cir. 2003)(citations omitted). Actionable copying requires two separate inquiries: (1) whether the alleged infringer actually used the copyrighted material in his own work; (2) whether "substantial similarity"

---

[3] Internal quotations, citations, and brackets omitted unless otherwise noted.

5

exists between the copyrighted work and the allegedly infringing work, which requires a side by side comparison of the two works. *Id.*

The Fifth Circuit has adopted sister circuit precedent for the contention that "the substantiality of the similarity is measured by considering the qualitative and quantitative significance of the copied portion in relation to the plaintiff's work as a whole." *Positive Black Talk Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 373 (5th Cir. 2004), *abrogated on separate grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010)(citing *King v. Innovation Books*, 976 F.2d 824, 829-30 (2d Cir. 1992)). The Fifth Circuit's initial inquiry of copyright infringement, therefore, mirrors the third factor of the fair use defense, "the amount and substantiality of the portion used in relation to the copyrighted work as a whole". *See* 17 U.S.C. § 107, *infra*.

Both parties have posited non-circuit authority for the doctrine of *de minimis non curat lex* and its applicability to copyright infringement. The Supreme Court states that "the venerable maxim *de minimis non curat lex* ("the law cares not for trifles") is part of the established background of legal principles against which all enactments are adopted, and which all enactments (absent contrary indication) are deemed to accept." *Wisconsin Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 231 (1992).

The parties agree that the doctrine is part of the initial inquiry of whether or not the use is infringement in the first instance, as opposed to the fair use inquiry, which is an affirmative defense. The Fifth Circuit recognizes the *de minimis* doctrine in the context of infringement cases, but it has not specifically enunciated its proper place in the infringement analysis. *See Compaq Computer Corp. v. Ergonome Inc.*, 387 F.3d 403, 406 (5th Cir. 2004)(affirming jury verdict rendered based on *de minimis* and fair use grounds); *Triangle Publications, Inc. v.*

*Knight-Ridder Newspapers, Inc.*, 626 F.2d 1171, 1177 (5th Cir. 1980)(reversing the District Court's rejection of the fair use defense because the harm suffered by plaintiff was *de minimis*, since it suffered no economic injury whatever from the infringement).

To conclude this preliminary discussion, the court considers both the substantial similarity and *de minimis* analyses in this case to be fundamentally related, and wholly encompassed within the fair use affirmative defense. Therefore, the court will utilize the fair use factors in making a determination on the *de minimis* and substantial similarity issues. Moreover, this circuit's precedent addressing the use of a *de minimis* analysis in copyright cases is largely undeveloped, and the court is reluctant to address it, except within the context of Sony's affirmative defense, fair use.[4]

2. Fair use

The Copyright Act provides:

[T]he fair use of a copyrighted work… for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include--

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

---

[4] Faulkner asserts that a 12(b)(6) motion is not a proper forum to consider an affirmative defense. The court disagrees. "[A] claim may also be dismissed if a successful affirmative defense appears clearly on the face of the pleadings." *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986). In this case, where no facts contained in the complaint are disputed, raising the affirmative defense in Sony's motion is equivalent to raising a defense suitable for a 12(b)(6) analysis. This issue is moot where, as here, the court addresses the affirmative defense but disposes of its ruling on separate grounds.

17 U.S.C. § 107. "Fair use is a mixed question of law and fact." *Harper & Row Publishers, Inc.v. Nation Enterprises*, 471 U.S. 539, 560 (1985). "Section 107 requires a case-by-case determination whether a particular use is fair, and the statute notes four nonexclusive factors to be considered." *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 549 (1985). Moreover, Section 107 does not change, narrow or enlarge the pre-existing judicial doctrine of fair use, which has been defined as "a privilege in others than the owner of the copyright to use the copyrighted material in a reasonable manner without his consent." *Id*. These factors are to be "weighed together, in light of the purposes of copyright… to promote science and the arts." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994).

  A. *Purpose and Character*

"The heart of the fair use inquiry is into the first specified statutory factor identified as the purpose and character of the use." *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006). "The central purpose of this investigation is to see… whether the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is transformative." *Campbell*, 510 U.S. at 579. "The goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works. Such works thus lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright, and the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Id*.

The speaker, time, place, and purpose of the quote in these two works are diametrically dissimilar. Here, a weighty and somber admonition in a serious piece of literature set in the Deep

South has been lifted to present day Paris, where a disgruntled fiancé, Gil, uses the phrase to bolster his cited precedent (that of Hemingway and Fitzgerald) in a comedic domestic argument with Inez. Moreover, the assertion that the past is not dead also bears literal meaning in Gil's life, in which he transports to the 1920's during the year 2011. It should go without saying that this use is highly distinguishable from an attorney imploring someone to accept responsibility for her past, a past which, to some extent, inculpates her for the death of her child.

Characters in both works use the quote for antithetical purposes of persuasion. On one hand is a serious attempt to save someone from the death penalty, and on the other is a fiancé trying to get a leg up in a fleeting domestic dispute. The use of these nine words in *Midnight* undoubtedly "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *See Campbell*, *supra*.

The court also considers it relevant that the copyrighted work is a serious piece of literature lifted for use in a speaking part in a movie comedy, as opposed to a printed portion of a novel printed in a newspaper, or a song's melody sampled in another song. This transmogrification in medium tips this factor in favor of transformative, and thus, fair use.

These factors coupled with the miniscule amount borrowed tip the scales in such heavy favor of transformative use that it diminishes the significance of considerations such as commercial use that would tip to the detriment of fair use. It is difficult to fathom that Sony somehow sought some substantial commercial benefit by infringing on copyrighted material for no more than eight seconds in a ninety minute film. Likewise, it is evident that this eight second clip serves as a thematic catharsis or apex in plot to neither *Requiem* nor *Midnight*.

    B.  *Nature of the Copyrighted Work*

9

Sony acknowledges that *Requiem* is entitled to the core protections of copyright law. Sony points out that in *Campbell* the court stated that "this fact, however, is not much help in this case, or ever likely to help much in separating the fair use sheep from the infringing goats in a parody case, since parodies almost invariably copy publicly known, expressive works." *Campbell*, 510 U.S. at 586. Faulkner suggests that this finding is limited in scope to parody cases, and, contending that *Midnight* did not parody *Requiem*, argues that this precedent is inapplicable to this case. The court declines to determine whether or not *Midnight*'s use constitutes a parody because it has found the work to be highly transformative under the first factor, whether parody or not. The court, at minimum, considers this portion of *Campbell* analogous to the use in *Midnight*, but ultimately deems this factor to be neutral.

### C. *Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole*

Faulkner concedes that *Midnight*'s use is not of quantitative importance, arguing instead that the alleged infringement is qualitative. Faulkner argues:

> In this case, the Quote describes the essence of *Requiem*: there is no such thing as past, whether for Jefferson or Temple Drake. The events of the past (for better or worse) cannot be discarded and forgotten; the history of mankind just as the personal history of Temple Drake shapes and forms human relations and conduct. As one critic has noted, the expression in the Quote is "central to the entire novel" – the "mainspring of both theme and narrative" – describing the "inescapability" of the past. Polk, Faulkner's *Requiem*, pp. 93-94 (Appendix "A" to this Brief). That Mr. Faulkner uniquely expressed this concept in the Quote is manifested by its fame, fame which led current President Barack Obama to use it in his most celebrated campaign speech addressing America's history of race relations ("A More Perfect Union").[5]

This argument addresses the qualitative importance of a theme in *Requiem*, not the qualitative importance of the quote itself, however eloquent in conveying this theme the quote may be.

---

[5] This argument presents matters outside the pleadings, which the court will not consider in this motion. As a practical matter, however, the court notes that acceptance of these extraneous matters as true do not change the court's conclusion, regardless of whether standards governing 12(b)(6) or summary judgment motions are used.

The copyright act itself states that "in no case does copyright protection for an original work of authorship extend to any idea… concept, [or] principle… regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b). Copyright law protects only form of expression and not the ideas expressed. *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 556 (1985)(citing *New York Times Co. v. United States*, 403 U.S. 713, 727 (1971)(Brennan, J., concurring)). "[A] copyright gives no exclusive right to the art disclosed; protection is given only to the expression of the idea—not the idea itself." *Mazer v. Stein*, 347 U.S. 201, 217 (1954).

The court's inquiry, therefore, is centered on the qualitative importance of the theme's *expression*, not of the theme itself. However, the quote constitutes only a small portion of the expression of this idea throughout the novel. The theme resurfaces at several points in the novel, such as:

> "There's no such thing as past either." [*Requiem*, 56]

> "The past is never dead. It's not even past." [*Requiem*, 73]

> "Because suddenly it could be as if it never been, never happened. You know: somebody – Hemingway, wasn't it? – wrote a book about how it had never actually happened to a g- woman, if she just refused to accept it, no matter who remembered, bragged…. Then Gowan came to Paris that winter and we were married… and if that couldn't fumigate an American past, what else this side of heaven could you hope for to remove stink?" [*Requiem*, pg. 121]

> "It was as though she realised for the first time that you – everyone – must, or anyway may have to, pay for your past; the past is something like a promissory note with a trick clause in it which, as long as nothing goes wrong, can be manumitted in an orderly manner, but which fate or luck or chance, can foreclose on you without warning." [*Requiem*, pg. 128]

> "Perhaps she was too busy between the three of them to be careful enough:… the doom, the fate, the past;…" [*Requiem*, pg. 130]

Clearly, the quote in dispute, the second of these, is a fragment of the idea's expression. In fact, had Sony copied half of these quotes, Faulkner might have a stronger argument under this element. This analysis is not influenced by the quote's subsequent fame as a succinct expression of the theme. Qualitative importance to society of a nine-word quote is not the same as qualitative importance to the originating work as a whole.

Moreover, it should go without saying that the quote at issue is of miniscule quantitative importance to the work as a whole. Thus, the court considers both the qualitative and quantitative analyses to tip in favor of fair use. The court concludes that no substantial similarity exists between the copyrighted work and the allegedly infringing work.

> D. *Effect of the Use upon the Potential Market for or Value of the Copyrighted Work*

This factor requires the court to "to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original… [and] also harm to the market for derivative works." *Campbell*, 510 U.S. at 590.

"Since fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets." *Campbell*, 510 U.S. at 594. "[I]t is impossible to deal with the fourth factor except by recognizing that a silent record on an important factor bearing on fair use disentitled the proponent of the defense…." *Id.* at 594. The record is silent on this factor. However, the court uses these factors to guide its determination under the *de minimis* and substantial similarity analyses. Moreover, the court considers this factor to be essentially a non-issue in light of the stark balance of the first factors weighing in favor of Sony as well as further considerations that follow.

12

The court is highly doubtful that any relevant markets have been harmed by the use in *Midnight*. How Hollywood's flattering and artful use of literary allusion is a point of litigation, not celebration, is beyond this court's comprehension. The court, in its appreciation for both William Faulkner as well as the homage paid him in Woody Allen's film, is more likely to suppose that the film indeed helped the plaintiff and the market value of *Requiem* if it had any effect at all. *Contra Campbell*, 510 U.S. at 590 ("Judge Leval gives the example of the film producer's appropriation of a composer's previously unknown song that turns the song into a commercial success; the boon to the song does not make the film's simple copying fair"). In fact, Faulkner has not pled any injury except for a statutory entitlement to an award. Such an entitlement does not hold up on a *de minimis* infraction, however. Had Faulkner pointed to compelling evidence that the markets for *Requiem* suffered a substantial harm as a result of the use in *Midnight*, this harm would be so anomalous that it would hardly undercut Sony's justification in presuming fair use.

Faulkner states that it "fully anticipates submitting evidence that it routinely enters into licensing agreements for its copyrighted materials, including *Requiem*, and that Sony's infringement, left unabated, will adversely impact Faulkner's ability to exploit for its financial benefit its property rights in *Requiem* and the Quote." The court is doubtful that any discovery to this effect will prove fruitful since the court does not consider a copyright holder to be entitled to licensing fees for fair use of his or her work.

Faulkner's response references other items on which it seeks discovery, such as whether or not Sony acted in good faith. The court considers this issue irrelevant notwithstanding Faulkner's cited precedent to the contrary.[6] Sony attributed Faulkner's work and used it through a character who was an enthusiastic admirer of Faulkner. Moreover, the complaint does not

---

[6] *Fuentes v. Mega Media Holdings, Inc.*, No. 09–22979–CIV, 2011 WL 2601356 (S.D. Fla. June 30, 2011).

provide facts from which bad faith could reasonably be inferred beyond conclusory allegations unlikely to withstand *Iqbal/Twombly* scrutiny. Even if Sony acted in bad faith, the only relevant fair use factor under which such conduct could be inferred would be under the fourth factor regarding relevant markets, which, again, would not undercut the stark balance in favor of Sony.

Moreover, even a bad faith attempt to injure Faulkner would not give rise to recovery because, as discussed at length, Sony would have had a good faith basis for believing it need not obtain permission for its use of the quote. That is, a bad faith effort to use a copyright holder's work under the fair use factors would be a contrived dichotomy that would be harmless when the use is so apparently fair. Any potential recovery accruing from such a use would not be any greater due to bad faith than from the diminished markets themselves. Thus, Faulkner's argument on bad faith is irrelevant.

Faulkner appears poised to present evidence that Sony received permission from other artists for use in *Midnight*, such as Cole Porter's song "Let's Do It (Let's Fall in Love)" and Pablo Picasso's artwork. This court's inquiry is whether the use of Faulkner's quote is fair use, not whether the rest of the work used in the film would have required a license agreement. Such considerations would require several detailed inquiries into the fair use of several other works. The court notes the obvious distinction between the use of Cole Porter and Pablo Picasso's work at the outset, however: they are used in their entirety while *Requiem* is used by fragment only. Thus, the court finds this consideration to be irrelevant.

Faulkner has not raised a reasonable expectation that discovery would lead to facts on which a judgment in its favor could be premised. The court determines, in light of the foregoing, that no substantial similarity exists between the copyrighted work and the allegedly infringing

work, and Sony's use in this matter was *de minimis*. The use is not actionable, and this claim is dismissed.

    **b. Lanham Act**

"The Lanham Act was intended to make actionable the deceptive and misleading use of marks, and to protect persons engaged in commerce against unfair competition." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28 (2003). Neither Faulkner's complaint nor its response in opposition guide this court as to the specific provisions of the Lanham Act allegedly violated by Sony, arguing instead for a violation of the Texas state law "tort of misappropriation", and drawing distinctions between the rights of publicity and of privacy. These arguments are irrelevant to whether or not a proper Lanham Act claim is before the court.

The court has no doubt that the interests of Sony in First Amendment protection outweigh Faulkner's interest in pursuing a Lanham Act claim in this case. However, the court declines to engage in a thorough analysis of this issue because a Lanham Act claim has not been established in the first place.

Faulkner alleges that the film will deceive or confuse "viewers as to a perceived affiliation, connection or association between William Faulkner and his works, on the one hand, and Sony, on the other hand". Faulkner also asserts that viewers might be deceived "as to the origin, sponsorship, or approval of Sony's goods, services, or commercial activity by William Faulkner and/or his written works."

These arguments are without merit. The only facts alleged are the two works themselves. The court has viewed both works, and, largely in light of the court's copyright analysis, it is satisfied that no such misappropriation can possibly be inferred. The movie contains literary allusion, the name Faulkner and a short paraphrase of his quote, neither of which can possibly be

said to confuse an audience as to an affiliation between Faulkner and Sony. Allusion is not synonymous with affiliation, nor with appropriation. Faulkner has not provided any precedent suggesting that the mere use of a celebrity name in an artistic work somehow rises to the level of deception.

Finally, and perhaps most importantly, the allegations asserted under this claim are wholly conclusory, and do not endure the heightened pleading requirement established in *Iqbal/Twombly*. All of the factual allegations of the complaint are undisputed by Sony. Faulkner, in essence, has proven all of the facts alleged, and seems to seek discovery as a means by which to develop his theory of the case. In this case, it is not entitled to such. Even under a summary judgment standard, there are no genuine issues of material fact from which a reasonable juror could find that Sony might have deceived or confused an audience. This claim is hereby dismissed.

   c.  **Commercial Misappropriation**

Faulkner also asserted a state law claim of commercial misappropriation. Having dismissed Faulkner's federal claims, the court declines to exercise jurisdiction over its state law claims. "Section 1367 authorizes a court to decline supplemental jurisdiction over a state law claim if: (1) the claim raises a novel or complex issue of state law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction; or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." *Brookshire Bros. Holding, Inc. v. Dayco Products, Inc.*, 554 F.3d 595, 602 (5th Cir. 2009)(citing 28 U.S.C. § 1367(c)). The general rule is that a court should decline to exercise jurisdiction over remaining state-law claims when all federal-law claims are eliminated before trial…." *Id*.

In light of the foregoing, the motion to dismiss [11] is GRANTED. The case is dismissed. Pursuant to Fed. R. Civ. P. 58, a separate judgment shall issue in accord with this opinion.

IT IS SO ORDERED, this the 18th day of July, 2013.

                                          **/s/ MICHAEL P. MILLS**
                                          **CHIEF JUDGE**
                                          **UNITED STATES DISTRICT COURT**
                                          **NORTHERN DISTRICT OF MISSISSIPPI**